UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CASIO INC.<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>PAPST LICENSING GMBH & CO. KG,<br>　　　　　　Defendant. | Civil Action No. 1:06 CV 01751<br><br>Judge: Gladys Kessler<br><br>Magistrate Judge: Robinson |
| PAPST LICENSING GMBH & CO. KG,<br>Counter-Plaintiff<br><br>v.<br><br>CASIO INC. and<br>CASIO COMPUTER CO., LTD.<br><br>Counter-Defendants | Next Court Deadline: Written Discovery<br>Requests by July 2, 2007 |

**PAPST'S MEMORANDUM IN OPPOSITION TO CASIO'S MOTION FOR RULE 37
SANCTIONS FOR PAPST'S NON-COMPLIANCE WITH THIS COURT'S ORDERS**

**I.　INTRODUCTION**

　　In full compliance with this Court's Order dated May 31, 2007, Papst Licensing GmbH &

Co. KG ("Papst") served Casio with its extensive supplemental interrogatory answers without

objections on June 11, 2007. Casio does not dispute that Papst's answers were served within the

time period set by that Order or that each interrogatory was answered. Casio's principal

complaint is that Papst has not provided even greater detail. However, given that the additional

details requested by Casio will require the discovery Casio has refused to produce to date, Casio

has no one to blame but itself.

For example, Casio still refuses to produce its documents relating to research, design, development, testing, manufacturing, and operation of the at-issue Casio Digital Cameras. As discussed in Papst's Supplemental Answers to Interrogatories, the claims of the Patents-In-Suit are largely focused on the internal operation of the electronic circuits of the Casio digital cameras. (Ex. A.). Because Casio has already stated that the internal operation of its cameras is supposedly confidential, a significant amount of the discovery in this case will concern Casio's confidential information, but which Casio refuses to produce to Papst. Although Papst is able to perform a preliminary infringement analysis based upon publicly available cameras and user manuals, Casio's supposedly confidential technical information is needed to verify and confirm the key technical aspects of Casio's cameras that Papst cannot see at this time. As an example, one claim element from the '399 patent generally requires a set of computer program instructions to perform certain functions. (Ex. A, pp. 8-9). Casio denies infringement of this element on the basis that Casio's program instructions do not perform the functions Papst claims they do. (Ex. B, pp. 22-23) Thus, the potentially most relevant evidence of infringement for this claim element will be Casio's actual computer program instructions to see what they exactly say. Once Papst is able to view Casio's confidential computer program instructions, Papst can further elaborate its infringement contentions by providing details on the functions performed. Casio seeks to prevent Papst from obtaining this crucial evidence pertaining to infringement.

The parties agree that a Protective Order is required, yet Casio insists that Welsh & Katz, Ltd. (long time trial counsel for Papst) should be denied access to all Casio confidential information in this case. It bears emphasis that Casio, not Papst, began this litigation by filing Casio's declaratory judgment action in this Court. Casio is using its untenable position regarding supposedly "confidential" documents and information as a weapon to delay producing its

confidential documents and information. If Casio truly believed that Welsh & Katz were not entitled to review Casio's supposedly confidential information, Casio would have moved for a Rule 26 Protective Order, rather than indefinitely delay its response to Papst's discovery.

When Casio failed to bring this issue to the attention of the Court, Papst took the initiative to file its own Motion for Entry of Protective Order on June 26, 2007. [Docket Nos. 50, 51] Consequently, it is Casio, not Papst, that should be blamed for not moving discovery forward. In summary, because Papst provided complete answers based upon information reasonably available at the time, Casio's motion should be denied.

## II. PAPST HAS FULLY COMPLIED WITH THE COURT'S ORDER TO PROVIDE COMPLETE RESPONSES TO CASIO'S INTERROGATORIES

On June 11, 2007, Papst fully complied with this Court's May 31, 2007 Order by providing its supplemental answers to Casio's first set of interrogatories. As discussed below, Papst fully answered each interrogatory based upon the information known to Papst at the time.

### A.    Interrogatory No. 1

This interrogatory requests that Papst "state in full and complete detail the bases for such charge of infringement…" In response, Papst provided 15 pages of detailed claim charts and 6 detailed schematic drawings fully demonstrating which Casio products infringe, which specific patent claims they infringe, how they infringe and how each element of each patent claim should be interpreted. (Ex. A, pp. 3-18).

### 1.    Accused Products

Casio's assertion that Papst does not identify "all accused products" is baseless. First, Casio's request does not even request Papst identify "all accused products." (Ex. A, p. 3) Second, Papst specifically answers that "Casio's digital still camera model nos. EX-P700, EX-S500, EX-Z60, EX-Z70, EX-Z110 and EX-Z600 ("Casio Infringing Products") literally infringe

at least claim 1 of United States Patent No. 6,470,399" and that "Casio's digital still camera

model nos. EX-P700, EX-S500, EX-Z60, EX-Z70, EX-Z110 and EX-Z600 ("Casio Infringing

Products") literally infringe at least claim 1 of United States Patent No. 6,895,449." (Ex. A, p. 3,

12). As such, Papst has identified at least six accused products known to be infringing.

Papst further informs Casio that Papst's infringement charges are not necessarily limited

to the accused six cameras because future discovery may provide evidence that other Casio

products infringe. (Id.) Many of the at-issue Casio cameras have been discontinued by Casio and

thus, are not available to Papst without further discovery. Furthermore, as demonstrated in

Papst's Answers to Interrogatories, the claims of the Patents-In-Suit are largely focused on the

internal operation of the electronic circuits of the Casio digital cameras. Because Casio has

intentionally withheld all of its confidential documents concerning the operations of the cameras,

Papst does not yet have the means to verify and confirm infringement of any other cameras. For

example, Casio refuses to produce all of its documents relating to research, design, development,

testing, manufacturing, and operation of the Casio Digital Cameras. (See, Ex. C, Papst Motion to

Compel [Docket # 52], p. 3)(citing Papst Document Request Nos. 2-5, 11-12); *see also,* 7

Moore's Federal Practice, 3rd Ed. § 33.102, p. 33-68 (Matthew Bender 2007)(party only has duty

to provide information available to it, and "does not have duty to search out new information in

response to interrogatories.")

Furthermore, many courts have recognized that very detailed infringement contentions

cannot practically be provided until after a substantial amount of discovery has taken place. *See,*

*e.g., Fischer and Porter Co. v. Tolson*, 143 F.R.D. 93, 95 (D. Penn. 1992)("contention

interrogatories are more appropriate after a substantial amount of discovery has been

conducted.")(quoting *Nestle Foods Corp. v. Aetna Casualty and Surety Co.*, 135 F.R.D. 101,

110-11 (D.N.J. 1990); *Brown v. United States*, 179 F.R.D. 101, 104 (W.D.N.Y. 1998); *B. Braun Medical, Inc. v. Abbott Laboratories,* 155 F.R.D. 525, 527 (E.D.Pa. 1994)(because a party may not have fully developed its case theories in the early stages of litigation, courts often find that contention interrogatories cannot be practically answered until the end of discovery). Nonetheless, Papst did provide complete answers based on information available to Papst, and thus complied with the Court' Order.

>       2.      The Asserted Claims

Casio's assertion that "Papst failed to identify the asserted patent claims" is simply false. As stated above, Papst identified six Casio cameras which infringe "at least claim 1" of the '399 patent and the '449 patent.  Because Casio has not produced a significant amount discovery concerning the internal operation of its cameras, Papst does not yet have the means to verify and confirm infringement of any other claims.  Therefore, Papst's answer is proper.

>       3.      Claim Interpretation

Casio's assertion that Papst "failed to provide its interpretations of the patent claim elements" is false.  For each claim element of each accused patent claim, Papst *did* provide a detailed claim interpretation.   (Ex. A, pp. 3-18) *See, e.g,*("A 'processor' reads on, for example, circuitry that interprets and executes program instructions.")("A 'memory' reads on, for example, circuitry that stores information in electronic form.").

Casio's claim that is unable to provide any invalidity analysis due to Papst's interpretation of a "host device" is misleading and false.   In its Supplemental Answers to Interrogatories, Casio already did provide an invalidity analysis on the "host device."  Casio first interprets "host device" to mean "a separate and distinct hardware component from the interface device or the data transmit/receive device." (Ex. B, p. 10).  Casio then states that the "host

device" element is present in the prior art because "The '532 [prior art] camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices." (Ex. B, pp. 27).  Thus, Casio's own answer demonstrates that Papst's response was sufficient to permit Casio to perform an invalidity analysis.

> 4.    How Casio Infringes

Casio's assertion that Papst "failed to provide any theory on how Casio could possibly be infringing" is false.  First, Casio's interrogatory never requested that Papst identify any certain "theory" of infringement such as inducement or contributory infringement under 35 U.S.C. § 271(b) and (c).   Second, Papst provided 15 pages of details explaining its theory of  how Casio's products "literally infringe."  For example, Papst provided the following interpretations and bases for infringement of the "host device" element:

**a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and**

Interpretation

A "host device" reads on, for example, a personal computer that utilizes Windows XP, Version 2002 with Service Pack 2 ("PC").
A "driver for input/output devices customary in a host device" reads on, for example, a software driver that is a part of an operating system of a personal computer when the personal computer is sold to an end user.
A "multi-purpose interface" reads on, for example, a port of a personal computer that can be used for two or more different purposes.

Application

The Casio Infringing Products can be connected to, for example, a personal computer that utilizes Windows XP, Version 2002 with Service Pack 2 ("PC") and that forms a "host device."  The files disk.sys and PartMgr.sys, as well as usbscan.sys, ptpusb.dll and ptpusd.dll, are included as standard programs in Windows XP, Version 2002 with Service Pack 2.  Disk.sys and PartMgr.sys form a software driver for input/output devices customary in a host device.  The files usbscan.sys, ptpusb.dll and ptpusd.dll also form a software driver for input/output devices customary in a host device.  The PC has at least one USB port, which is a multi-purpose interface.

(Ex. A, pp. 4-5) As such, Papst has complied with Casio's request and answered how Casio's digital cameras infringe Papst's patents.

Casio's real complaint is its belief that Papst's evidence of infringement is insufficient to prove infringement. (See, Casio Motion, p. 4)("Papst supplemental does not … provide even the smallest shred of evidence that could support them"). However, that evidentiary issue to be decided by the finder of fact in this case is much different from the issue of whether Papst provided its infringement contentions. The adequacy of Papst's infringement case ought to be tested by a trial, not by a metric regarding the adequacy of interrogatory answers. Clearly, Papst has provided complete responses to Interrogatory No. 1, and Casio's motion should be denied.

B.    Interrogatory No. 2

This interrogatory ask Papst to identify alleged prior art. Casio does not deny that Papst has complied by specifically listing every single reference that has been identified by others as potential prior art to the patents-in-suit. (Ex. A, pp. 19-22) Casio also does not deny it is proper for Papst to also "identify" these documents under Rule 33(d), and that Papst did promise to provide a letter identifying the designated documents by Bates Number once the documents were numbered. On June 25, 2007, Papst provided its responsive documents in compliance with the Court's June 27, 2007 Order, and Papst provided its designations by letter on June 29, 2007. (Ex. D). Thus, the issue is moot.

C.    Interrogatory No. 3

This interrogatory seeks Papst's contentions on the secondary considerations relating to Casio's invalidity theory. Papst answered this Interrogatory by specifically identifying which of the many potential secondary consideration factors it believes at this time will support the validity of its patents. Because discovery from Casio and others has not yet taken place on this

issue, there is no further information that Papst can verify in its answers at this time. As Papst stated in its answer, "Papst Licensing has not yet determined the remaining information requested in this Interrogatory. Accordingly, Papst Licensing plans to later amend and/or supplement its responses, if necessary, with additional information based upon further investigation and discovery, and to rely upon such information in the course of this action and at trial." Therefore, Papst's response is proper.

      D.     <u>Interrogatory No. 4</u>

This interrogatory seeks information concerning Papst's attempts to license the at-issue Patents. In response, Papst identified each company with which Papst has discussed a potential license and promised to provide a letter under Rule 33(d) which would identify by Bates number all responsive documents that provide information responsive to this request. On June 25, 2007, Papst provided its responsive documents, up until the date the Complaint was filed, and Papst provided its designations by letter on June 29, 2007. (Ex. D). Thus, the issue is moot.

Casio complains that Papst has not identified all oral communications with the potential licensees is also unfounded. To the extent that oral communications occurred, Papst has produced and identified the documents and letters that follow its customary practice of memorializing the subjects of the oral communications on licensing, who was present for the communications and the terms discussed. In other words, the information Casio has been provided to it in the documents produced by Papst. Fed.R.Civ.P. 33(d)(option to produce business records) Thus, Papst's response is complete and proper.

      E.     <u>Interrogatory No. 5</u>

Papst answered this Interrogatory seeking information concerning the ordinary skill in the art and the state of the art based on information available at this time. Because discovery from

Casio and others has not yet taken place on these issues, there is no further information that Papst can verify in its answers at this time. As Papst stated in its answer, "Papst Licensing has not yet determined the remaining information requested in this Interrogatory. Accordingly, Papst Licensing plans to later amend and/or supplement its responses, if necessary, with additional information based upon further investigation and discovery, and to rely upon such information in the course of this action and at trial." Therefore, Papst complied with this Interrogatory based upon the information known to it at the time.

      F.    <u>Interrogatory No. 6</u>

This interrogatory seeks information concerning Papst's knowledge about the conception and reduction to practice of the alleged inventions. Casio asked this information even though it is fully aware that the conception and reduction to practice of the alleged inventions was done by a third-party, Michael Tasler in Germany, and not Papst. Nonetheless, Papst committed to provide a letter under Rule 33(d) which would identify by Bates number all documents which will provide Papst's knowledge responsive to this request. Casio's principal complaint is the timing of Papst's letter. However, not until sufficient discovery is completed with respect to Mr. Tasler's conception and reduction will Papst have enough information to verify its answer that will "describe in full and complete detail the facts concerning the conception and reduction to practice." Papst expects it will be able to provide a letter under Rule 33(d) within the next three weeks.

Casio's second concern that Papst's did not perform *any* investigation concerning this interrogatory based upon its statement that it will continue to investigate the issue once additional discovery is received in this case is unfounded. Rule 26(e) permits and also requires a

party to supplement its discovery responses "at appropriate intervals." As such, Papst has fully complied with this interrogatory.

**III.    CASIO'S REQUESTED SANCTIONS ARE IMPROPER**

Each of Casio's sanctions is unwarranted because Papst has provided its complete and proper answers to each interrogatory. Casio's principal complaint that Papst does not provide additional details concerning Casio's products is Casio's own fault. If Casio would have produced the information requested months ago by Papst, discovery would have been further along and Papst would have likely had more details concerning Casio's product to disclose. *See,* Papst's pending Motion to Compel. [Docket # 52]. Papst is simply unable to disclose the information that Casio refuses to provide in the first place.

The only cases cited by Casio in its Motion concern the sanction of dismissal, which Casio does not request here. To the extent that Casio seeks monetary sanctions and evidentiary sanctions precluding evidence, those draconian sanctions are improper given that Papst has complied with the Court's May 31, 2007 Order and Papst has answered Casio's Interrogatories. Therefore, Casio's Motion should be denied in its entirety.

Respectfully submitted,

Date: July 2, 2007

Campbell Killefer (Bar No. 268433)
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4000

Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza,
22nd Floor
Chicago, IL 60606
*Attorneys for Papst Licensing GmbH & Co. KG*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon the following counsel for Plaintiff and Counterclaim Defendant Casio Inc. and Counterclaim Defendant Casio Computer Co., Ltd. through the Court's ECF electronic service and by regular U.S. mail, postage prepaid, this 2nd day of July, 2007:

J. Kevin Fee
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004

Jeffrey M. Gold
Laura Krawczyk
MORGAN LEWIS & BROCKIUS LLP
101 Park Avenue
New York, New York 10178

Scott D. Stimpson
The Law Office of Scott Stimpson
Suite 1102
445 Hamilton Avenue
White Plains, NY 10601
**Counsel for Casio Inc. and Casio Computer Co., Ltd.**

Campbell Killefer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CASIO INC. | |
| Plaintiff, | Civil Action No. 1:06 CV 01751 |
| v. | Judge: Gladys Kessler |
| PAPST LICENSING GMBH & CO. KG<br>Defendant. | |
| PAPST LICENSING GMBH & CO. KG | |
| Counter-Plaintiff | |
| v. | |
| CASIO INC. and<br>CASIO COMPUTER CO., LTD. | |
| Counter-Defendants | |

**DEFENDANT PAPST LICENSING GMBH & CO. KG'S FIRST SUPPLEMENTAL
ANSWERS TO PLAINTIFF CASIO INC.'S FIRST SET OF
INTERROGATORIES (NOS. 1-6)**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Papst

Licensing GmbH & Co. KG ("Papst Licensing"), supplements its answers Casio Inc.'s

First Set of Interrogatories as follows:

**PRELIMINARY STATEMENTS**

1.      These answers are a supplement to Papst Licensing's Answers to Plaintiff

Casio Inc.'s First Set of Interrogatories (Nos. 1-6) served on May 30, 2007.

2.      Papst Licensing has not completed its investigation of the facts relating to

this action.  Accordingly, with respect to all of the Interrogatories, Papst Licensing

reserves the right to amend and/or supplement its responses, if necessary, with additional

information based upon further investigation and discovery, and to rely upon such

information in the course of this action and at trial.

   3.  In those instances where the responses to Casio Inc.'s interrogatories can

be derived from the business records of Papst Licensing or from an examination, audit or

inspection of such business records, and the burden of deriving or ascertaining the answer

is substantially the same for Casio Inc. and Papst Licensing,  Papst Licensing will specify

the records from which an answer may be ascertained and afford Casio Inc.'s counsel a

reasonable opportunity to audit, inspect and copy such records or provide categorized

copies of such records in accordance with Federal Rule of Civil Procedure 33(d).

   4.  Pending before this Court is Papst Licensing's Motion for Clarification

which requests the Court to clarify whether Papst Licensing should disclose its

information that is protected by the work product doctrine, the attorney-client privilege or

any other privilege recognized by law.   Until such time as the Court rules on the Motion

for Clarification, Papst Licensing cannot disclose such information that is protected by

the work product doctrine, the attorney-client privilege or any other privilege recognized

by law.

   5.  Pending before this Court is Papst Licensing's Motion for Clarification

which requests the Court to clarify whether Papst Licensing should disclose confidential

information that will be protected under a future Protective Order.   Pursuant to

agreement by the parties dated June 5, 2007, Papst Licensing will disclose its confidential

information on an outside counsel only basis until the protective order issues are resolved

by the Court.

6.    Soon pending before this Court will be Papst Licensing's Objections to

U.S. Magistrate Robinson's May 31, 2007 rulings on discovery issues.  Should U.S.

District Court Judge Kessler rule differently on those issues, Papst Licensing reserves the

right to further supplement these answers accordingly.

<u>**ANSWERS TO INTERROGATORIES**</u>

<u>INTERROGATORY NO. 1</u>

Separately with respect to each claim of the patents-in-suit asserted by Papst to be infringed (directly or indirectly), and for each accused product, state in full and complete detail the bases for such charge of infringement including, but not limited to, how Papst contends that each element of each such claim should be interpreted and provide a detailed element-by-element comparison for each claim with each such product (identifying where in each accused product each element is allegedly found, or otherwise specifically identifying which feature of each accused product is alleged to meet each claim element).   For each element allegedly met under the doctrine of equivalents, specifically state all reasons why Papst contends the element in the accused product is insubstantially different.

<u>ANSWER:</u>

<u>**U.S. Patent No. 6,470,399**</u>

Subject to the Preliminary Statements above which are incorporated herein and

upon information and belief, Casio's digital still camera model nos. EX-P700, EX-S500,

EX-Z60, EX-Z70, EX-Z110 and EX-Z600[1] ("Casio Infringing Products") literally

infringe at least claim 1 of United States Patent No. 6,470,399.  Each claim element is set

---

[1]    Papst Licensing's infringement charges are not limited to the above-noted Casio digital still cameras.  Rather, the infringement charges are intended to include all Casio products (*e.g.*, digital video cameras and digital sound recorders) that, from an infringement standpoint, have a construction that is similar to that of the

forth hereinafter in bold and underlined typeface. Presented in underlined typeface below each claim element is Papst Licensing's position as to how each claim element should be interpreted, and how each claim element reads on the Casio Infringing Products.

## 1. An interface device for communication between

### Interpretation

This claim element reads on, for example, electronic circuitry that allows a device from which analog data is to be obtained to be connected to a host device such as a personal computer, subject to the other features of the claim that describe the interface device.

### Application

Six schematic, block diagrams are attached hereto as Exhibit A which show some of the components of each one of the above-referenced Casio digital still cameras. The Casio Infringing Products include an "interface device" that is formed by at least a portion of the CPU and the on-chip memory that are a part of the camera and audio chip.

## a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and

### Interpretation

A "host device" reads on, for example, a personal computer that utilizes Windows XP, Version 2002 with Service Pack 2 ("PC").

A "driver for input/output devices customary in a host device" reads on, for example, a software driver that is a part of an operating system of a personal computer when the personal computer is sold to an end user.

A "multi-purpose interface" reads on, for example, a port of a personal computer

---

above-noted digital still cameras.

that can be used for two or more different purposes.

<u>Application</u>

The Casio Infringing Products can be connected to, for example, a personal computer that utilizes Windows XP, Version 2002 with Service Pack 2 ("PC") and that forms a "host device." The files disk.sys and PartMgr.sys, as well as usbscan.sys, ptpusb.dll and ptpusd.dll, are included as standard programs in Windows XP, Version 2002 with Service Pack 2. Disk.sys and PartMgr.sys form a software driver for input/output devices customary in a host device. The files usbscan.sys, ptpusb.dll and ptpusd.dll also form a software driver for input/output devices customary in a host device. The PC has at least one USB port, which is a multi-purpose interface.

**<u>a data transmit/receive device, the data transmit/receive device<br>being arranged for providing analog data, comprising:</u>**

<u>Interpretation</u>

A "data transmit/receive device" reads on, for example, a device that is adapted to "receive" data by being exposed to an analog wave signal, the device being further adapted to "transmit" or provide analog data.

<u>Application</u>

The Casio Infringing Products include a first "data transmit/receive device" formed at least in part by a lens and the diode array formed in a CCD chip that converts light into analog data that is representative of an image.

The Casio Infringing Products include a second "data transmit/receive device" formed at least in part by a transducer inside of a microphone that converts sound waves into an analog sound signal.

**<u>a processor;</u>**

<u>Interpretation</u>

A "processor" reads on, for example, circuitry that interprets and executes program instructions.

<u>Application</u>

The Casio Infringing Products include a camera and audio chip, at least a portion of which forms a "processor."

**<u>a memory;</u>**

<u>Interpretation</u>

A "memory" reads on, for example, circuitry that stores information in electronic form that is subject to recall.

<u>Application</u>

The Casio Infringing Products include an on-chip memory that is located on the camera and audio chip and a memory card that can be located in a socket. The on-chip memory forms at least a portion of the claimed "memory."

**<u>a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and</u>**

<u>Interpretation</u>

The above-referenced claim element reads on, for example, circuitry that allows the above-referenced interface device to be electrically connected to a multi-purpose user interface of a personal computer such as a USB port.

<u>Application</u>

The Casio Infringing Products include a USB socket that can be connected to a USB port of a personal computer by a USB cable. The Casio Infringing Products also include a USB interface that is located on the camera and audio chip. The "first

connecting device" is formed by at least the USB socket, the USB interface on the

camera and audio chip, and the electrical connections between the two.

## a second connecting device for interfacing the
## interface device with the data transmit/receive device,

### Interpretation

The above-quoted claim element reads on, for example, circuitry that connects the

above-referenced data transmit/receive device to the above-referenced interface device,

subject to the other features of the claim that describe the second connecting device.

### Application

The Casio Infringing Products include a CCD chip having a gates and registers

block, as well as a CCD controller chip that includes an a/d converter and a CCD

controller. At least the a/d converter, the gates and registers block, and the CCD

controller form at least a portion of a first "second connecting device."

The Casio Infringing Products include a camera and audio chip having a sample

and hold circuit and an a/d converter that receives an analog sound signal from a

microphone. At least the transducer in the microphone, as well as the a/d converter and

the sample and hold circuit on the camera and audio chip, form at least a portion of a

second "second connecting device."

## the second connecting device including a sampling circuit
## for sampling the analog data provided by the data transmit/receive device and

### Interpretation

The above-referenced claim element reads on, for example, circuitry that couples

a device that generates analog data that is representative of an analog wave signal (*e.g.*,

light or sound waves) to an analog to digital converter.

<u>Application</u>

The Casio Infringing Products include a gates and registers block that forms a part of a CCD chip and a CCD controller that forms a part of a CCD controller chip. At least the gates and registers block and the CCD controller form at least a portion of a first "sampling circuit."

The Casio Infringing Products include a camera and audio chip that has a sample and hold circuit. The sample and hold circuit samples and holds the analog sound signal provided by the transducer of the microphone, and forms at least a portion of a second "sampling circuit."

**<u>an analog-to-digital converter for converting<br>data sampled by the sampling circuit into digital data,</u>**

<u>Interpretation</u>

This claim element reads on, for example, circuitry that converts an analog signal into a digital signal.

<u>Application</u>

The Casio Infringing Products include an a/d converter that forms a part of the CCD controller chip. The a/d converter converts the analog data supplied to it from the gates and registers block into digital data that is representative of an image.

The Casio Infringing Products include a second a/d converter that forms a part of the camera and audio chip. The second a/d converter converts the analog data supplied to it from the transducer of the microphone into digital data that is representative of a sound signal.

**<u>wherein the interface device is configured by the processor and the memory</u>**

8

**to include a first command interpreter and a second command interpreter,**

Interpretation

This claim element reads on, for example, a set of program instructions that is stored in a memory of a device in accordance with the other claim elements that are executed by a processor of the device to cause the device to operate in a certain way as described later in the claim.

Application

An instruction set is programmed into the on-chip memory of the camera and audio chip of the Casio Infringing Products. At least a portion of the instruction set forms a "first command interpreter" and a "second command interpreter."

**wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device,**

Interpretation

This claim element reads on, for example, a set of program instructions that is adapted to cause the device under control of the processor, after an inquiry signal from a multi-purpose interface of a personal computer is received and processed, to automatically and without user intervention send a response signal to the personal computer's multi-purpose interface. The set of program instructions causes the response signal to contain data that, when received and processed by the personal computer, allows the personal computer to automatically and without user intervention understand how to communicate with and receive data from a peripheral device.

Application

9

The USB socket of the Casio Infringing Products is adapted to receive inquiry signals that the PC sends to its USB port to determine when something is operatively coupled thereto. The "first command interpreter" is adapted to cause the CPU on the camera and audio chip to send, after the USB socket is coupled to the PC's USB port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera and audio chip to the PC's USB port.

When the Casio Infringing Products are in Mass Storage mode, the response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver that is formed by disk.sys and PartMgr.sys.

When the Casio Infringing Products are in PTP mode, the response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver that is formed by usbscan.sys, ptpusb.dll and ptpusd.dll.

**whereupon the host device communicates with the interface device
by means of the driver for the input/output device customary in a host device, and**

Interpretation

This claim element reads on, for example, the above-referenced interface device that communicates with and transmits data to a personal computer by means of a software driver for an input/output device customary in a host device.

Application

When the Casio Infringing Products are in Mass Storage mode, the instruction set stored in the on-chip memory of the Casio Infringing Products is adapted to utilize a

software driver formed by disk.sys and PartMgr.sys to allow the "interface device" to communicate with the PC.

When the Casio Infringing Products are in PTP mode, the instruction set stored in the on-chip memory of the Casio Infringing Products is adapted to utilize a software driver formed by usbscan.sys, ptpusb.dll and ptpusd.dll to allow the "interface device" to communicate with the PC.

**wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device.**

<u>Interpretation</u>

This claim element reads on, for example, a set of program instructions that is adapted to interpret a data request command from a multi-purpose interface of a personal computer as being a command to transfer digitized analog data stored in the above-referenced memory.

<u>Application</u>

The USB socket and USB interface of the Casio Infringing Products is adapted to receive data request commands that the PC sends through the USB port. The "second command interpreter" is adapted to cause the CPU to interpret a data request command from the PC as being a command to initiate a transfer of digital data to the PC. The digital data can include digitized still pictures, digitized video, and digitized sound files.

**U.S. Patent No. 6,895,449**

Subject to the Preliminary Statements above which are incorporated herein and upon information and belief, Casio's digital still camera model nos. EX-P700, EX-S500, EX-Z60, EX-Z70, EX-Z110 and EX-Z600[2] ("Casio Infringing Products") literally infringe at least claim 1 of United States Patent No. 6,895,449. Each claim element is set forth hereinafter in bold and underlined typeface. Presented in underlined typeface below each claim element is Papst Licensing's position as to how each claim element should be interpreted, and how each claim element reads on the Casio Infringing Products.

### 1. An interface device for communication between

#### Interpretation

This claim element reads on, for example, electronic circuitry that allows a device from which analog data is to be obtained to be connected to a host device such as a personal computer, subject to the other features of the claim that describe the interface device.

#### Application

Six schematic, block diagrams are attached hereto as Exhibit A which show some of the components of each one of the above-referenced Casio digital still cameras. The Casio Infringing Products include an "interface device" that is formed by at least a portion of the CPU and the on-chip memory that are a part of the camera and audio chip.

---

[2]    Papst Licensing's infringement charges are not limited to the above-noted Casio digital still cameras. Rather, the infringement charges are intended to include all Casio products (*e.g.*, digital video cameras and digital sound recorders) that, from an infringement standpoint, have a construction that is similar to that of the above-noted digital still cameras.

**a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and**

Interpretation

A "host device" reads on, for example, a personal computer that utilizes Windows XP, Version 2002 with Service Pack 2 ("PC").

A "driver for input/output devices customary in a host device" reads on, for example, a software driver that is a part of an operating system of a personal computer when the personal computer is sold to an end user.

A "multi-purpose interface" reads on, for example, a port of a personal computer that can be used for two or more different purposes.

Application

The Casio Infringing Products can be connected to, for example, a personal computer that utilizes Windows XP, Version 2002 with Service Pack 2 ("PC") and that forms a "host device." The files disk.sys and PartMgr.sys, as well as usbscan.sys, ptpusb.dll and ptpusd.dll, are included as standard programs in Windows XP, Version 2002 with Service Pack 2. Disk.sys and PartMgr.sys form a software driver for input/output devices customary in a host device. The files usbscan.sys, ptpusb.dll and ptpusd.dll also form a software driver for input/output devices customary in a host device. The PC has at least one USB port, which is a multi-purpose interface.

**a data transmit/receive device comprising the following features:**

Interpretation

A "data transmit/receive device" reads on, for example, a device that is adapted to "receive" data by being exposed to an analog wave signal, the device being further adapted to "transmit" or provide analog data.

<u>Application</u>

The Casio Infringing Products include a first "data transmit/receive device" formed at least in part by a lens and the diode array formed in a CCD chip that converts light into analog data that is representative of an image.

The Casio Infringing Products include a second "data transmit/receive device" formed at least in part by a transducer inside of a microphone that converts sound waves into an analog sound signal.

**<u>a processor;</u>**

<u>Interpretation</u>

A "processor" reads on, for example, circuitry that interprets and executes program instructions.

<u>Application</u>

The Casio Infringing Products include a camera and audio chip, at least a portion of which forms a "processor."

**<u>a memory;</u>**

<u>Interpretation</u>

A "memory" reads on, for example, circuitry that stores information in electronic form that is subject to recall.

<u>Application</u>

The Casio Infringing Products include an on-chip memory that is located on the camera and audio chip and a memory card that can be located in a socket. The on-chip memory forms at least a portion of the claimed "memory."

**<u>a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and</u>**

14

<u>Interpretation</u>

The above-referenced claim element reads on, for example, circuitry that allows the above-referenced interface device to be electrically connected to a multi-purpose user interface of a personal computer such as a USB port.

<u>Application</u>

The Casio Infringing Products include a USB socket that can be connected to a USB port of a personal computer by a USB cable. The Casio Infringing Products also include a USB interface that is located on the camera and audio chip. The "first connecting device" is formed by at least the USB socket, the USB interface on the camera and audio chip, and the electrical connections between the two.

**<u>a second connecting device for interfacing the interface device with the data transmit/receive device,</u>**

<u>Interpretation</u>

The above-quoted claim element reads on, for example, circuitry that connects the above-referenced data transmit/receive device to the above-referenced interface device and converts the analog data from the data transmit/receive device to digital data.

<u>Application</u>

The Casio Infringing Products include a CCD chip having a gates and registers block, as well as a CCD controller chip that includes an a/d converter and a CCD controller. At least the a/d converter, the gates and registers block, and the CCD controller form at least a portion of a first "second connecting device."

The Casio Infringing Products include a camera and audio chip having a sample and hold circuit and an a/d converter that receives an analog sound signal from a microphone. At least the transducer in the microphone, as well as the a/d converter and

the sample and hold circuit on the camera and audio chip, form at least a portion of a

second "second connecting device."

**wherein the interface device is configured by the processor and the memory in
such a way that the interface device, when receiving an inquiry from the host
device as to the type of a device attached to the multi-purpose interface
of the host device, sends a signal, regardless of the type of the data
transmit/receive device attached to the second connecting device of the
interface device, to the host device which signals to the host device that it
is a storage device customary in a host device,**

Interpretation

This claim element reads on, for example, a set of program instructions that is

adapted to cause the device under control of the processor, after an inquiry signal from a

multi-purpose interface of a personal computer is received and processed, to

automatically and without user intervention send a response signal to the personal

computer's multi-purpose interface.  The set of program instructions causes the response

signal to contain data that, when received and processed by the personal computer, allows

the personal computer to automatically and without user intervention understand how to

communicate with and receive data from a peripheral device.

Application

The USB socket of the Casio Infringing Products is adapted to receive inquiry

signals that the PC sends to its USB port to determine when something is operatively

coupled thereto.

An instruction set is programmed into the on-chip memory of the camera and

audio chip of the Casio Infringing Products.  The instruction set is adapted to cause the

CPU on the camera and audio chip to send, after the USB socket is coupled to the PC's

USB port, and after an inquiry signal has been received and processed, a response signal

comprising data stored in the on-chip memory defined in the camera and audio chip to the PC's USB port.

When the Casio Infringing Products are in Mass Storage mode, the response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver that is formed by disk.sys and PartMgr.sys.

When the Casio Infringing Products are in PTP mode, the response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver that is formed by usbscan.sys, ptpusb.dll and ptpusd.dll.

**whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and**

Interpretation

This claim element reads on, for example, the above-referenced interface device that communicates with and transmits data to a personal computer by means of a software driver for an input/output device customary in a host device.

Application

When the Casio Infringing Products are in Mass Storage mode, the instruction set stored in the on-chip memory of the Casio Infringing Products is adapted to utilize a software driver formed by disk.sys and PartMgr.sys to allow the "interface device" to communicate with the PC.

When the Casio Infringing Products are in PTP mode, the instruction set stored in the on-chip memory of the Casio Infringing Products is adapted to utilize a software driver formed by usbscan.sys, ptpusb.dll and ptpusd.dll to allow the "interface device" to

communicate with the PC.

**wherein the interface device is arranged for simulating a virtual file
system to the host, the virtual file system including a directory structure.**

Interpretation

This claim element reads on, for example, the memory of the above-referenced

"interface device" that is adapted to simulate a virtual file system by containing therein

"virtual" data. The data is virtual in the sense that it is representative of something else.

This claim element also reads on, for example, an interface device that sends a

signal to a personal computer that informs the personal computer that the interface device

has a rotatable disk memory when, in actuality, the interface device has an integrated

circuit memory. By doing so, the interface device is simulating a virtual file system.

Application

The instruction set stored in the on-chip memory of the Casio Infringing Products

is adapted to store pictures in a file system and a directory structure defined in its

memory. The file system is "virtual" in the sense that the data stored therein is "virtual"

– the digitized data digitized still pictures, digitized video, and digitized sound files being

representative of images, moving images and sound waves. After the USB socket of the

Casio Infringing Products is coupled to a USB port on a PC, a representation of all of the

digitized analog data that are stored in memory is shown on the screen of the PC as being

contained in a file folder.

The Casio Infringing Products simulate a virtual file system for an additional

reason. When in mass storage mode, each Casio Infringing Product is adapted to inform

a personal computer that each Casio Infringing Product contains a rotatable disk memory

when, in actuality, each Casio Infringing Product contains an integrated circuit memory.

18

INTERROGATORY NO. 2

Identify all prior art, including but not limited to prior art that has been asserted by others relating to one or both patents-in-suit.

ANSWER:

Subject to the Preliminary Statements above which are incorporated herein, the following references have been identified by others as potential prior art to the patents-in-suit. To the extent this Interrogatory requests details concerning each reference, the references will be produced under Rule 33(d) and the references will disclose details to the extent Papst Licensing is aware of them. Papst Licensing will identify those documents by Bates number in a letter after Papst Licensing produces the documents.

**US Patents**

3,714,635; 3,805,245; 3,976,979; 4,509,113; 4,642,759; 4,680,732; 4,888,680; 4,901,275; 4,972,470; 5,070,474; 5,088,033; 5,131,089; 5,197,128; 5,214,761; 5,291,584; 5,296,611; 5,297,124; 5,379,382; 5,430,855; 5,444,644; 5,487,154; 5,493,335; 5,499,378; 5,506,692; 5,508,821; 5,510,774; 5,524,047; 5,528,765; 5,532,825; 5,548,782; 5,548,783; 5,581,741; 5,614,948; 5,639,606; 5,712,682; 5,724,574; 5,748,924; 5,765,027; 5,778,205; 5,784,581; 5,812,879; 5,841,471; 5,844,961; 5,871,368; 5,875,415; 5,884,103; 5,914,748; 5,915,106; 5,920,709; 5,923,193; 5,926,208; 5,929,903; 5,969,750; 5,991,530; 5,995,080; 6,005,613; 6,012,113; 6,026,217; 6,081,856; 6,086,430; 6,088,532; 6,098,116; 6,101,276; 6,119,180; 6,131,125; 6,167,456; 6,182,145; 6,188,675; 6,286,073; 6,292,589; 6,298,388; 6,470,399; 6,545,775; 6,895,449; 7,051,281

**Japanese Patents**

53145535 A; 61034652 A; 61060164 A; 01303554 A; 01293404 A; 02114351 A;
09016506 A; JP 8-191410

**Other Documents**

IEEE Standard for a High Performance Serial Bus, 1996. 392 pp. (IEEE Std 1394-1995);
Digidesign 882/20 I/O Audio Interface Installation Guide, 14 pp.; Information
Technology – Serial Bus Protocol 2 (SBP -2), T10 Project 1155D, Revision 4, 5/19/98,
107 pp.;An American National Standard, IEEE Standard for a Simple 32-Bit Backplane
Bus: NuBus; 1998, 51 pp. (ANSI/IEEE 1196-1987); Polaroid Digital Camera PDC-2000
User Guide for Macintosh or Windows applications (142 pp.); apple-history.com,
Macintosh Quadra 650 (with NuBus Slots), Apple Computer, Inc., (produce introduced
10/93) 11/29/05, 2 pp.; Wang, James www.sims.berkeley.edu Third Party NuBus AV
(Audio-Video) Cards, 1993-1996 1 pg.; Accredited Standards Committee X3,
Information Technolgoy, John Lohmeyer, X3T10/96-202r1, Agenda and Results of
Meeting, X3T10 SCSI Working  Group Meeting, 07/24/96 (6 pp.); Intel Corporation,
Universal Host Controller Interface Design Guide (UHCI), Revision 1.1, March 1996 (47
pp.); Twain Working Group Committee, Twain Toolkit Release V1.6, Twain
Specification Release, 2/5/96 (367 pp.); Digidesign Website, www.digidesign.com,
Tabular cross-reference "Pro Tools 4.0.1 NuBus Systems compatibility" as supported by
Digidesign, Inc., Palo Alto, CA, 3 pp.; Twain Working Group, www.twain.org, About
Twain, 4 pp.; Pournelle Alex, Jetsend Technology Allows Device connectivity with No
Servers, Drivers, or Code, Computer Technology Review, 07/1999, Vol. 19, Iss. 7, Pg.
22, 4 pp.; Business Editors/Technology Writers, Salutation Port-of-Entry Software Lets
Application Developers Control Network Peripherals from the Windows Desktop,

Business Wire, 07/13/98, Pg. 1 (3 pp.); Wire Feed, HP Introduces JetSend for Pocket PC

JetSend Solutions Now Compatible with Complete Range of Microsoft Windows CE-

and Pocket PC-based Products, M2 Presswire, 4/26/2000, Pg. 1 (3 pp.); Stedman, John

HP and TROY Group Extend JetSend Protocal to Simplify Printing Over Networks and

the Internet; JetSend Protocal Expands Cutting-edge Capabilities to Non-HP Printers, HP

Deskjet Printers, Legacy HP LaserJet Printers and Future Products, M2 Presswire,

2/10/2000, Pg. 1 (2 pp.); Business Editors, An Industry First, TROY Group's NetSend

Makes Up to 9 Million HP Legacy Printers Internet-Ready, Business Wire, 11/16/99, Pg.

1 (3 pp.); Keele, Richard Designing Control Units that Interface Peripherals to the IBM

I/O Channel, Computer Technology Review, Fall 1988; Vol. 8, Iss. 13, pg. 71 (1 page);

Lang, Michael Optical Server Uses Network Protocal for Plug-and Play Integration,

Computer Technology Review, 12/1993, Vol 13, Iss. 15, pg. 85 (3 pp.); Bursky, Dave

Inter-System Communication Standard to Ease Clustered System Implementation,

Electronic Design, 10/13/97, Vol. 45, Iss. 22, pg. 32 (3 pp.); Hadden, Thomas H., Tape

Drive Without Backup Software? Wait No More, Computer Technology Review Los

Angeles, 10/1995, Vol. 15 Iss. 10, p. 34 (4 pp.); Ferelli, Mark, 12-inch WORM becomes

the key to document image processing Computer Technology Review Los Angeles,

3/1994, Vol. 14, Iss. 3, p. 1 (3 pp.); Nelson, Andy Catching a Direct Bus. InfoWorld,

6/17/96, VOl. 18, Iss. 25, pg. 129 (2 pp.); DeMonker, Judy 120 Moves Into Clustering,

Storage Arenas, InfoWorld, 12/9/96, Vol. 18, Iss. 50, p. 37 (2 pp.); Krause, Reinhardt I/O

Driver Spec to be Unveiled, Electronic News, 1/29/96, Vol. 42, Iss. 2101, pg. 1 (3 pp.);

Microsoft Windows 95 README for MS-DOS Device Drivers, 08/95, pg. 1 (2 pp.);

Lang, Michael Optical server uses network protocols for plug-and-play integration,

Computer Technology Review: Special Fall Issue, Los Angeles, Dec. 1993, Vol. 13, Iss.

15 p. 85 (6 pp.); Universal Serial Bus Specification," 1.0 Final Draft Revision, November

13, 1995; Universal Serial Bus Specification," Revision 1.0, January 15, 1996


INTERROGATORY NO. 3

     Identify all alleged secondary considerations or other objective evidence that defendant contends evidence non-obviousness of any one or more of the claims of the '449 and '399 patents, state all supporting facts including all evidence attributing the secondary considerations to the claims, identify all persons having knowledge or such facts, and identify all documents relating to, referring to, describing or constituting any response hereto.

**ANSWER:**

     Subject to the Preliminary Statements above which are incorporated herein, the

following is a list of secondary considerations that may support the non-obviousness of

the at-issue claims of the '449 and '399 patents: commercial success, the failure of others

to provide a solution to a long standing problem, the long felt need for the inventions

disclosed in the '449 and '399 patents,  future licenses to the '449 and '399 patents, the

unexpected results of the inventions disclosed in the '449 and '399 patents, copying of

the inventions disclosed in the '449 and '399 patents, skepticism about the merits of the

inventions disclosed in the '449 and '399 patents, and skepticism about whether the

inventions disclosed in the '449 and '399 patents would solve the problem presented.

     Papst Licensing has not yet determined the remaining information requested in

this Interrogatory.  Accordingly, Papst Licensing plans to later amend and/or supplement

its responses, if necessary, with additional information based upon further investigation

and discovery, and to rely upon such information in the course of this action and at trial.

INTERROGATORY NO. 4

Identify all persons with or to whom Papst or any other person, has discussed a license, offered a license, negotiated a license or agreed to a license under the patents-in-suit (or any claim thereof), including, but not limited to, the identity of each person communicated with, the date of such communication, the financial terms of such discussion, offer, negotiation or license, the identity of all documents and things concerning each such discussion, offer, negotiation or license, and the identity of persons most knowledgeable about each such discussion, offer, negotiation or license.

**ANSWER:**

Subject to the Preliminary Statements above which are incorporated herein, non-privileged communications with third-parties will be provided under Rule 33(d). To the extent this Interrogatory requests details concerning each person, the produced documents will disclose details to the extent Papst Licensing is aware of them. Papst Licensing will identify those documents by Bates number in a letter after Papst Licensing produces the documents. Papst Licensing has discussed a potential license to either U.S. Patent No. 6,895,449 or U.S. Patent No. 6,470,399, or both, with the following entities: Acer, Hewlett Packard, Samsung, Canon, Sony, Casio, Olympus, Nikon, Konica, Fujifilm, Kodak, Sanyo, Pentax, Ricoh, BenQ, Kyocera, Panasonic, Polaroid, VIVITAR, PREMIER, HON HAI, Sony Ericsson, Flextronics Int'l Ltd., Nokia, LG Electronics, Matsushita, Toshiba, Character Group LLC, JVC, AIPTEK, DXG, Mustek, MPIO, Creative, Jungsoft, RIM, Centon, Cowon, and Astone.


INTERROGATORY NO. 5

State the art area and level of ordinary skill in the art pertaining to the patents-in-suit and state in detail all bases for each such contention.

ANSWER:

Subject to the Preliminary Statements above which are incorporated herein, Papst

Licensing has not yet determined the art area, the level of ordinary skill in the art, and all

bases for any such contentions.  Accordingly, Papst Licensing plans to later amend and/or

supplement its responses, if necessary, with additional information based upon further

investigation and discovery, and to rely upon such information in the course of this action

and at trial.

INTERROGATORY NO. 6

      Separately for each claim of the patents-in-suit that Papst asserts is infringed by
Casio, describe in full and complete detail the facts concerning the conception and
reduction to practice of the alleged invention.  To be complete, your response should state
the specific dates of such conception and reduction to practice, identify each person
involved in such conception and reduction to practice, describe the location and
circumstances of the conception and reduction to practice, and identify all documents and
things tending to establish, refute or identify the dates, locations, individuals or
circumstances sought in this interrogatory and any alleged corroboration.

ANSWER:

      Subject to the Preliminary Statements above which are incorporated herein, non-

privileged documents will be provided under Rule 33(d) relating to conception and

reduction to practice information to the extent Papst Licensing is aware of it.  Papst

Licensing will identify those documents by Bates number in a letter after Papst Licensing

produces the documents.  Papst Licensing plans to later amend and/or supplement its

responses, if necessary, with additional information based upon further investigation and

discovery, and to rely upon such information in the course of this action and at trial.

Dated:  June 11, 2007

AS TO PRELIMINARY STATEMENTS:

/s/ Joseph E. Cwik
Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza ● 22nd Floor
Chicago, Illinois 60606
(312) 655-1500

Campbell Killefer (Bar No. 268433)
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4000
**Attorneys for Defendant/Counter-Plaintiff Papst Licensing GmbH & Co. KG**

**VERIFICATION UNDER 28 U.S.C. § 1746**

The undersigned, hereby verifies, under penalty of perjury under the laws of the

United States, that he has read the responses set forth above, and that he believes, on

information and belief, including information known by him and information supplied by

others, that the foregoing responses are true and correct.


Executed on: _____, 2007          _____

                                       Authorized Representative of Papst
                                       Licensing GmbH & Co. KG

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing DEFENDANT PAPST LICENSING GMBH & CO. KG'S SUPPLEMENTAL ANSWERS TO PLAINTIFF CASIO INC.'S FIRST SET OF INTERROGATORIES (NOS. 1-6) was served on this the 11th day of June, 2007 upon the attorneys for Casio Inc. as follows:

**VIA E-MAIL**
J. Kevin Fee
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
jkfee@morganlewis.com

**VIA E-MAIL**
Jeffrey Gold
Laura Krawczyk
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178
jgold@morganlewis.com
lkrawczyk@morganlewis.com

**VIA E-MAIL**
Scott D. Stimpson
The Law Office of Scott Stimpson
Suite 1102
445 Hamilton Ave.
White Plains, New York 10601
stimpsonlaw@gmail.com
**Counsel for Casio Inc. and Casio Computer Co., Ltd.**

/s/ Joseph E. Cwik
Attorney for Papst Licensing GmbH & Co.
KG



Casio EXILIM P700 Digital Still Camera

EXHIBIT A



Casio EXILIM S500 Digital Still Camera



Casio Exilim EX-Z70 Digital Still Camera



Casio EXILIM Z600 Digital Still Camera



Casio EXILIM Z110 Digital Still Camera



Casio EXILIM Z60 Digital Still Camera

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
----------------------------------------------x
CASIO INC.                              :
                                        :
                Plaintiff,              :
                                        :
        v.                              :        Civil Action No. 1:06 CV 01751
                                        :
                                        :        Judge: Gladys Kessler
PAPST LICENSING GMBH & CO. KG           :        Magistrate: Deborah A. Robinson
                                        :
                Defendant.              :
                                        :
_____:
                                        :
PAPST LICENSING GMBH & CO. KG           :
                                        :
                Counter-Plaintiff       :
        v.                              :
                                        :
                                        :
CASIO INC. and                          :
CASIO COMPUTER CO., LTD.                 :
                                        :
                Counter-Defendants.  :
                                        :
----------------------------------------------x
```

## CASIO INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PAPST LICENSING GMBH & CO. KG'S FIRST SET OF INTERROGATORIES TO CASIO INC.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff /Counter-

Defendant, Casio Inc., through counsel, hereby provides a supplemental response to Papst's First

Set of Interrogatories.

## GENERAL OBJECTIONS

The General Objections and Objections to Instructions and Definitions provided in

Casio's initial response to these interrogatories are incorporated by reference.

## PAPST'S INTERROGATORIES

**INTERROGATORY NO. 1:**        Describe in full and complete detail how each Casio Digital Camera does not infringe each of the Patents-in-Suit.

## OBJECTIONS:

Casio Inc. objects to the deceptive nature in which this interrogatory was written. Stating the interrogatory in this manner, and "defining" it to be wildly overbroad and to request information not even remotely related to the request as written, is an obvious attempt to deceive Casio Inc. into inadvertently waiving objections, or dupe the Court into thinking that Papst is being reasonable in its requests. The request violates Federal Rule 26(g) as "defined" in the Papst instructions, and Papst is hereby put on notice that, in the event this interrogatory is ever brought before the Court, the full overbroad scope of what Papst seeks must be shown to the Court, including the deceptive manner in which Papst attempted to get that information.

Casio Inc. objects to the definition provided to this interrogatory, as overbroad, unduly burdensome, calling for irrelevant information not reasonably calculated to lead to the discovery of admissible information, as calling for information that is subject to the attorney client privilege, work product, or other immunity, and calls for disclosure of confidential information to Welsh & Katz. Casio will respond only by considering the actual interrogatory recited above, and will provide information only for the first independent claims of the patents as Papst has to date refused to (or has been unable to) explain how the Casio cameras supposedly infringe on these patents, and has not identified any allegedly infringed claims. Casio will only address the claim elements that are missing, not every claim element, and Casio will provide reasonable detail on the reasons for non-infringement. All other requests are overly broad, unduly burdensome, call for information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Casio reserves its right to supplement this response as the case proceeds, including but not limited to supplementation after the Court construes the claims, or upon learning Papst's proposed constructions and contentions which, to date, Papst has been unable to provide.

Casio objects to this Interrogatory as improperly being characterized as one interrogatory because its many subparts constitute separate interrogatories. See Fed. R. Civ. P. 33(a).

Subject to its general and specific objections, Casio responds as follows.

## FIRST RESPONSE

Casio's cameras do not infringe Papst's patents because Casio's cameras do not meet every claim limitation either literally or under the doctrine of equivalents when comparing the properly construed claims to the accused products. At least the following claim elements are missing from Casio's cameras. Citations in this section are to the '399 patent, but as the '449 patent has the same specification, the support can equally be found in that patent and Casio will rely on the specifications of both patents.

## Interface device

No Casio Digital Camera has the required limitation of an "interface device" as that term is properly construed. Both patents teach an interface device that is separate from the transmit/receive ("T/R") device. For example, the '399 patent states at 8:23-33: "In the interface device according to the present invention, an enormous advantage is to be gained . . . in separating the actual hardware . . . [which] allows a plurality of dissimilar device types. . . .". Similarly, at 1:55-64, the patent discusses different uses of the interface, e.g., a "large number of applications," and it refers to "any data transmit/receive devices which can be attached to the second connecting device. . . ." (7:41-43). The patents also state that "the interface device according to the present invention . . . [can be used] as an interface between a host device and almost any data transmit/receive device" ('399 patent, 7:45-49).

The patent claims also clearly require that the interface be separate from the transmit/receive device. See, for example, the language that requires connecting devices for interfacing them, and the language that requires the host to ask what type of device is "attached" to the interface, and requires the interface device to send a signal to the host "regardless of the type of the data transmit/receive device attached." Thus, the claim language itself makes the ability of a transmit/receive device to "attach" very clear, particularly when considered in light of the specification noted above.

The patents distinguish prior art devices with specific drivers for specific transmit/receive devices. See, e.g ., '399 patent at 1:20-34. They also teach that the interface must be "flexible to permit attachment of very different electrical or electronic systems to a host device by means of the interface...." Id. At 1:56-60. Every embodiment disclosed in the patents has a separate interface device, and there is inadequate support under 35 U.S.C. 112 for anything but a separate interface device.

All these teachings are inconsistent with an analysis that has the interface device be a selected group of components within the camera itself. This concept runs through both patents and there is never any indication that the applicants had anything in mind other than a separate structure for the interface.

As with all missing claim elements, it is very difficult for Casio to try to explain why there is no infringement by equivalents, as Papst has been unable to provide even a literal infringement analysis, let alone an analysis by equivalents. However, it is clear that any attempt to read this interface limitation and the related language of the claim requiring that devices "attach" to the interface would improperly vitiate this claim language. Moreover, there are clearly very substantial differences in the Casio products and the claimed structure. Indeed, the "enormous advantage" taught by the patents themselves, and the "flexible" nature of the claimed structure are completely missing in the Casio cameras. And given that prior art was distinguished on this ground, no reasonable equivalents analysis could capture the Casio cameras. Casio reserves its right to supplement this response, should Papst ever be able to provide a realistic infringement analysis.

## Data transmit/receive device

No Casio Digital Camera has the required limitation of a "data transmit/receive device" ("T/R device") as that term is properly construed. A T/R device would be understood by a person of ordinary skill in the art to mean a device that transmits and receives information in the

same form. Thus, the CCD identified by Papst as the T/R device could not possibly meet this limitation, as it converts light into an electrical signal – a completely different form of data.

If the patentee had meant that different types of data could be transmitted and received, the claim could have said "a transmit device and a receive device" and these could have transmitted and received different types of data.   A data/transmit device is not a device for converting data from one form to another, as is the CCD of the Casio cameras.

With regard to equivalents, this required element is completely missing, and thus any attempt to capture the Casio products under the doctrine of equivalents would improperly vitiate these claim terms in their entirety.   It is clear that the Casio CCD functions in a substantially different way, and achieves a different result.   Casio has no idea how Papst intends to try to use the doctrine of equivalents to eviscerate this claim limitation, or even if Papst will continue to believe the CCD meets this limitation, and so reserves its right to supplement this response should Papst ever attempt to make such an argument.

## Communication between

Further, because Casio's Digital Cameras lack the required limitation that there be a communication between the lens/CCD and host, Casio does not infringe any claim of the '399 or '449 patents.

The "communication between" limitation is part of every claim of the '399 and '449 patents.   When properly construed, the T/R device and host must have two-way communication, not just data transfer from one to the other.   The word "between" requires two-way communication, and later language in the claims uses the words "from" and "to" showing a contrast with the "between" language used for this communication. *Cf. e.g.*, "a data request command from the host device to the type of input/output device…" and "transfer of the digital data to the host device."  This language also shows that communication between the host and T/R device must be bi-directional (commands from the host and data transfer from the T/R device, i.e., if the host requests the data, the T/R device must be able to send data in response thereto).   There must be an interchange or exchange of data, as claimed and as plainly taught in the specification. *See, e.g.,* the abstract ("communication between"); '399, 1:9-14 (distinguishing data acquisition and two-way communication).

The lens/CCD of the Casio cameras (which counsel for Papst has alleged to be the T/R device) never receives data from the computer, and in fact, that lens/CCD is not functional at all when the camera is connected to the computer.   The only communication with the computer is a communication between the computer and the camera memory, the computer never communicates" with the lens/CCD.

Even if "communication between" is construed to not require two-way communication, the Casio lens/CCD combination does not communicate at all with the host computer.   Rather, the lens/CCD merely sends data to the Analog to Digital ("A/D") converter, and that data is stored in the camera memory.   When the camera is attached to the computer, the computer collects information directly from the camera memory.   The lens/CCD is not involved in the function of communicating with the computer.   The '399 patent, at column 5, lines 47-63, discusses first that data must be "acquired, and transferred to the host device," and in the very next sentence distinguishes that from communication: "The data transmit/receive device itself can also communicate actively with the host device."  The communication is described as something different from an intermediate memory merely storing and then sending on data to the

host, and it requires, as the claims state, actual communication between the T/R device and the host computer. See also, 6:55-68 (the host computer user reading data "from the data transmit/receive device . . ." and discussing the interface function of transferring data "from the data transmit/receive device . . . to the host device . . . ."). The patents distinguish the claimed communication between the host and T/R device from "communication between the host device and interface device" ('399 patent, at 7:14-15).

With regard to equivalents, this required element is completely missing, and thus any attempt to capture the Casio products under the doctrine of equivalents would improperly vitiate these claim terms in their entirety. Moreover, the Casio products function in a substantially different way, in that the cameras do not perform a function that is substantially the same as bi-directional communication. Rather, communication cannot take place between the host device and the imaging portion of the camera. Casio does not know how, if at all, Papst intends to try to use the doctrine of equivalents to eviscerate this claim limitation, and so reserves its right to supplement this response should Papst ever attempt to make such an argument.

**Configured by the processor and memory**

Even assuming that the Casio CPU and memory are part of an "interface device" as counsel for Papst has asserted, the interpreters in that alleged interface are certainly not configured "by" the processor and memory as expressly required by the claims. The "interpreters" in that alleged interface, to the extent they can even be argued to exist, are software. This software is simply loaded into the memory. The Casio processor has nothing to do with that operation. The memory of the Casio cameras also do not "configure" this in any way, but merely store the software.

The requirement that the interface device interpreters be configured by the processor and memory is not only clear from the claim language, but also from the specification. *See, e.g.,* '399 patent, 3:36-47, 3:58-67, 4:65-5:6.

With regard to equivalents, this required element is completely missing, and thus any attempt to capture the Casio products under the doctrine of equivalents would improperly vitiate these claim terms in their entirety. Moreover, the Casio products function in a substantially different way, in that the processor and memory do nothing to configure as required by the claims, and instead software is simply loaded into the Casio cameras. The prosecution history also provides guidance. *See e.g.,* March 18, 2002 Response to Office Action. Casio has no idea how Papst intends to try to use the doctrine of equivalents to eviscerate this claim limitation, and so reserves its right to supplement this response should Papst ever attempt to make such an argument.

**Input/output device customary in a host device, regardless of the device attached**

Further, no claim of the '399 patent nor the '449 patent are infringed by Casio because no Casio Digital Camera has the required limitation of an "input/output device customary in a host device," as that term is properly construed. The claims require that the first command interpreter send a signal to the host that *it is* an "input/output device customary in a host device." The Casio camera signals that it is a Casio camera, not a device "customary in a host device," and it does not provide this information "regardless" of "the device attached".

The patent specification clearly supports the plain and ordinary meaning. *See, e.g.,* Abstract (regardless of the device attached); '399 patent, 3:36-47; 3:59-67, 4:8-20, 4:60-5:6; 6:19-22.

The claims and the file history both require that the interface device "lie" to the host computer about the real nature of the device. Indeed, prior art was distinguished on precisely this ground during prosecution, creating an estoppel. As above, Casio cameras never lie to the host computer. Rather, the Casio cameras identify themselves as Casio cameras.

This required element is also completely missing, and thus any attempt to capture the Casio products under the doctrine of equivalents would improperly vitiate these claim terms in their entirety. Moreover, the Casio products function in a substantially different way, in that the cameras identify themselves to a host device only for the specific hardware arrangement of the camera itself and no other. This is neither substantially the same function as "regardless" of "the device attached" nor substantially the same way. Casio does not know how Papst intends to try to use the doctrine of equivalents to eviscerate this claim limitation, and so reserves its right to supplement this response should Papst ever attempt to make such an argument.

## Virtual file system

With respect specifically to the claims of the '449 patent, all require the interface device to simulate a virtual file system. A virtual file system is described, for example, in the '399 patent at 6:1-3: the interface device "simulates a hard disk with a root directory whose entries are 'virtual' and can be created for the most varied functions." Also, as described in the '449 patent at 11:1-6 and the '339 patent at 11:66-12:4: "Using the ASPI manager the interface device according to the present invention can now obtain active access to an SCSI hard disk of the host device connected to the same SCSI bus which, in contrast to the interface device, cannot be a virtual but a real SCSI mass storage device or also a further interface device according to the present invention." *See also,* '399 patent, 12:25-33, and the '449 prosecution history (e.g., 5/17/04 Notice of Allowability).

In the Casio cameras, the computer directly accesses a real file system. The system is not "virtual" in any sense of the word.

With regard to equivalents, this required element is also completely missing, and thus any attempt to capture the Casio products under the doctrine of equivalents would improperly vitiate these claim terms in their entirety. Moreover, the Casio products function in a substantially different way, in that with respect to Casio cameras, the computer directly accesses a real file system. The system is not "virtual" in any way. Casio has no idea how Papst intends to try to use the doctrine of equivalents to eviscerate this claim limitation, and so reserves its right to supplement this response should Papst ever attempt to make such an argument.

## SUPPLEMENTAL RESPONSE

All the objections and responses in our First Responses are incorporated by reference.

Casio Inc.'s proposed claim constructions were already provided above for the elements that appear to be at issue, but Casio, Inc. herein supplements those constructions in a good faith

effort to address questions of counsel for Papst, and despite Papst's refusal to provide proper claim constructions as ordered by the Court.   Casio reserves its right to supplement this response as the case proceeds, including but not limited to supplementation after the Court construes the claims, or upon learning Papst's proposed constructions and contentions which, to date, Papst has been unable to provide.

Casio notes that it has not been accused of direct infringement of any claim, nor could it be because it does not make or sell the host.  Despite repeated Court orders to explain how it is contending that Casio infringes, Papst has not provided any cogent theory of infringement.  Papst should be precluded from advancing any infringement theory now, but to the extent that ever happens, Casio will respond and supplement as necessary.

**I.     Claim 1 of United States Patent 6,470,399**

**A.     <u>An interface device for communication between</u>**

**<u>"Interface Device" interpretation</u>**:   "Interface Device" means a physically separate and distinct component different from the host device or the Data Transmit/Receive Device that is capable of regulating the electrical communications between host device and a plurality of interchangeable data transmit/receive devices.

Both patents teach an interface device that is separate from the transmit/receive ("T/R") device.  For example, the '399 patent states at 8:23-33: "In the interface device according to the present invention, an enormous advantage is to be gained . . . in separating the actual hardware . . . . [which] allows a plurality of dissimilar device types. . . .".  Similarly, at 1:55-64, the patent discusses different uses of the interface, e.g., a "large number of applications," and it refers to "any data transmit/receive devices which can be attached to the second connecting device. . . ." (7:41-43).  The patents also state that "the interface device according to the present invention . . .

[can be used] as an interface between a host device and almost any data transmit/receive device" ('399 patent, 7:45-49).    See also the claims, which refer to a "multi-purpose" interface.

The patent claims also clearly require that the interface be separate from the transmit/receive device.    See, for example, the language that requires connecting devices for interfacing them, and the language that requires the host to ask what type of device is "attached" to the interface, and requires the interface device to send a signal to the host "regardless of the type of the data transmit/receive device attached."    Thus, the claim language itself makes the ability of a transmit/receive device to "attach" very clear, particularly when considered in light of the specification noted above.

The patents distinguish prior art devices with specific drivers for specific transmit/receive devices.    *See, e.g* ., '399 patent at 1:20-34.  They also teach that the interface must be "flexible to permit attachment of very different electrical or electronic systems to a host device by means of the interface...." *Id.* at 1:56-60.  Every embodiment disclosed in the patents has a separate interface device, and there is inadequate support under 35 U.S.C. 112 for anything but a separate interface device.    Casio also relies on the plain and ordinary meaning of these terms.

**"communication between" interpretation**:    "Communication Between" means two-way communication directly between the host and input/output device.

The "communication between" limitation is part of every claim of the '399 and '449 patents.  When properly construed, the T/R device and host must have two-way communication, not just data transfer from one to the other.  The word "between" requires two-way communication, and later language in the claims uses the words "from" and "to" showing a contrast with the "between" language used for this communication.  *Cf. e.g.*, "a data request command from the host device to the type of input/output device..." and "transfer of the digital

data to the host device." This language also shows that communication between the host and T/R device must be bi-directional (commands from the host and data transfer from the T/R device, i.e., if the host requests the data, the T/R device must be able to send data in response thereto). There must be an interchange or exchange of data, as claimed and as plainly taught in the specification. *See, e.g.,* the abstract ("communication between"); '399, 1:9-14 (distinguishing data acquisition and two-way communication).

The '399 patent, at column 5, lines 47-63, also discusses first that data must be "acquired, and transferred to the host device," and in the very next sentence distinguishes that from communication: "The data transmit/receive device itself can also communicate actively with the host device." The communication is described as something different from an intermediate memory merely storing and then sending on data to the host, and it requires, as the claims state, actual communication between the T/R device and the host computer. *See also,* 6:55-68 (the host computer user reading data "from the data transmit/receive device . . ." and discussing the interface function of transferring data "from the data transmit/receive device . . . to the host device . . . ."). The patents distinguish the claimed communication between the host and T/R device from "communication between the host device and interface device" ('399 patent, at 7:14-15). Casio also relies on the plain and ordinary meaning of these terms.

<u>No Infringement</u>

The Casio cameras are not and do not have Interface Devices as properly construed, as they have no separate interface, and they have nothing with the ability to regulate a plurality of interchangeable devices. The Casio cameras also do not have two way communications between the host device and interface device. Accordingly, these elements provide two reasons

why there is no infringement.   With regard to equivalents, that has not been asserted by Papst.

See also Casio's first response.

**B.**     **a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and**

**Interpretation** :  "Host Device" means a separate and distinct hardware component from the interface device or the data transmit/receive device.  The host device must include software drivers for input/output devices that are connected to the interface device and "customary in a host device" (see below), and also drivers for a multipurpose interface.   Casio also relies on the plain and ordinary meaning of these terms.

**"customary" interpretation:**   The term "customary" in the context of the '399 and '449 patents is vague and unsupported for any interpretation other than for "drivers for hard disks, for graphics devices or for printer devices ... or other storage devices such as floppy disk drives, CD-ROM drives or tape drives."  In any event, there is nothing in the patents that suggests that cameras would be "customary".  See '399 patent col. 4, lns. 27-39.  Indeed the word "camera" never appears in the patent specification at all.  Casio also relies on the plain and ordinary meaning of these terms.

No Infringement

The Casio cameras do not have host devices as properly construed.   They are sold as stand-alone cameras.  Casio cameras also have nothing to do with any "customary" drivers for hard disks, for graphics devices or for printer devices or other storage devices such as floppy disk drives, CD-ROM drives or tape drives.   With regard to equivalents, that has not been asserted by Papst.  See also Casio's first response.

**C.**     **a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising:**

**Interpretation** :  "Data Transmit/Receive Device" means a distinct piece of hardware separate from an Interface Device capable of providing and/or receiving analog data directly to and/or from a host device through the separate Interface Device.   The Data Transmit/Receive Device must transmit and receive information in the same form.

A Data Transmit/Receive Device limitation is part of every claim of the '399 and '449 patents.  A "T/R" device would be understood by a person of ordinary skill in the art to mean a device that transmits and receives information in the same form.   Moreover, if the patentee had meant that different types of data could be transmitted and received, the claim could have said "a transmit device and a receive device" and these could have transmitted and received different types of data.  A data/transmit device is not a device for converting data from one form to another.  Further, one of ordinary skill in the art would recognize that the claim itself requires that the data format of the communication be analog, as opposed to digital.  Casio also relies on the plain and ordinary meaning of these terms.

No Infringement

Casio's digital cameras are unitary pieces of hardware without interface devices separate from data transmit/receive devices.   Casio's digital cameras do not have any components that can both transmit and receive analog data, and the components alleged by Papst to meet these limitations do not transmit and receive data in the same form.   With regard to equivalents, that has not been asserted by Papst.  See also Casio's first response.

**D.**     **a processor;**

**Interpretation:**  Processor means the microprocessor of a computer capable of receiving and executing logical instructions. Casio also relies on the plain and ordinary meaning of this term.

<u>No Infringement</u>

Casio does not dispute that its cameras have a processor, but does not infringe due to the many other missing claim elements.   See also Casio's first response.


**E.      <u>a memory;</u>**

<u>Interpretation</u>:  Memory has its ordinary meaning, and includes any memory.  '399 patent col. 7, lns 23-29.  Casio also relies on the plain and ordinary meaning of this term.

<u>No Infringement</u>

Casio does not dispute that its cameras have a memory, but does not infringe due to the many other missing claim elements.   See also Casio's first response.

**F.      <u>a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and</u>**

<u>Interpretation</u>:  "First connecting device" means the component of the interface device that electrically connects the host device to the separate interface device.   The first connecting device also allows direct, two way communication between the host device and the interface device.

<u>No Infringement</u>

Casio does not provide any host device with its digital cameras and so does not meet this element of the claim, and Papst has not asserted any indirect claims of infringement.   Moreover, as Casio has no "interface device" as properly interpreted, that provides another reason why this language is not met.  With regard to equivalents, that has not been asserted by Papst.  See also Casio's first response.

**G.** **a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data,**

**Interpretation:** This language means a component of the interface device that electrically connects a transmit/receive device to the separate interface device. The second connecting device also must allow direct, two way communication between a transmit/receive device and the interface device. Also, the second connecting device must include both a circuit for sampling the analog data that is provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data. Casio also relies on the plain and ordinary meaning of this phrase.

No Infringement

Casio's digital cameras have no second connecting device that electrically connects a transmit/receive device to a physically separate interface device. Casio's digital cameras also have no second connecting device that allows direct, two way communication between a transmit/receive device to the separate interface device. With regard to equivalents, Papst has not asserted infringement by equivalents. See also Casio's first response.

**H.** **wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter,**

**Interpretation:** This phrase means that the processor and the memory built into the interface device together are responsible for the configuration of the interface device into a distinct first command interpreter and a distinct second command interpreter. First command interpreter and second command interpreter are defined elsewhere. The interface device must be configured by the processor and memory, which does not include simply downloading software into the camera from an external source.

The requirement that the interface device interpreters be configured by the processor and memory is not only clear from the claim language, but also from the specification. *See, e.g.*, '399 patent, 3:36-47, 3:58-67, 4:65-5:6.

This configuration must also create all of the functionality required as defined in the definition of the first command interpreter and second command interpreter.

<u>No Infringement</u>

The Casio processor and memory do not configure anything that functions as a distinct first command interpreter or a distinct second command interpreter.   With regard to equivalents, Papst has not asserted infringement by equivalents.  See also Casio's first response.

I.    **wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device,**

**Interpretation:** This means a structure within the interface device that is configured by the processor and memory of the interface device.  The first command interpreter must be capable of sending a signal to the host device when an inquiry from the host device is received requesting the type of a device that is attached to the interface device.   The signal sent to the host by the first command interpreter must "lie" to the host and tell the host that something other that what is connected to the host is connected. *See, eg.,* File History of the '399 patent.  This means that regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, the host device must receive a signal that an input/output device "customary" (see response to Interrogatory No. 2) in a host device is attached to the second

connecting device of the interface device. Casio also relies on the plain and ordinary meanings of this phrase.

No Infringement

Casio's digital cameras have no structure or functionality that is configured by any interface device's processor and memory that functions as required by this claim language. Further, Casio's digital cameras never "lie" to the host computer about what is connected. With regard to equivalents, Papst has not asserted infringement by equivalents. See also Casio's first response.

**J.     whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and**

**Interpretation** : This phrase means that the host device communicates with the interface device using a driver that is "customary" in a host device. The communication, through the "customary" driver must occur regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device. See the response to Interrogatory No. 2 regarding the "customary" language of the claim.

No Infringement

Casio's digital cameras do not communicate using a "customary" driver, as that term is not clear. See the response to Interrogatory No. 2. With regard to equivalents, Papst has not asserted infringement by equivalents. See also Casio's first response.

**K.     wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device.**

**Interpretation:** "Second command interpreter" means a structure or component within the interface device that is configured by the processor and memory of the interface device. This

second command interpreter must be capable receiving a data request command from a host

computer in the format of a device that the first command interpreter had previously "lied" to the

host computer about.   This second command interpreter must be capable of understanding the

data request command from the host as a data transfer command for initiating the transfer of

digital data to the host device.

No Infringement

Casio's digital cameras have no structure or functionality that is configured by any

interface device's processor and memory that functions as required by the term second command

interpreter.  With regard to equivalents, Papst has not asserted infringement by equivalents.  See

also Casio's first response.

**II.      Claim 1 of U.S. Patent No. 6,895,449**

**A.      An interface device for communication between**

**"Interface Device" interpretation**:  "Interface Device" means a physically separate and distinct

component different from the host device or the Data Transmit/Receive Device that is capable of

regulating the electrical communications between host device and a plurality of interchangeable

kinds of data transmit/receive devices.

Both patents teach an interface device that is separate from the transmit/receive ("T/R")

device.  For example, the '449 patent states at 7:23-30: "In the interface device according to the

present invention, an enormous advantage is to be gained . . . in separating the actual hardware . .

. [which] allows a plurality of dissimilar device types. . . .".  Similarly, at 1:56-65, the patent

discusses different uses of the interface, e.g., a "large number of applications," and it refers to

"any data transmit/receive devices which can be attached to the second connecting device. . . ."

(6:41-42).  The patents also state that "the interface device according to the present invention . . .

[can be used] as an interface between a host device and almost any data transmit/receive device" ('449 patent, 6:45-49).    See also the claims, which refer to a "multi-purpose" interface.

The patent claims also clearly require that the interface be separate from the transmit/receive device.  See, for example, the language that requires connecting devices for interfacing them, and the language that requires the host to ask what type of device is "attached" to the interface, and requires the interface device to send a signal to the host "regardless of the type of the data transmit/receive device attached."  Thus, the claim language itself makes the ability of a transmit/receive device to "attach" very clear, particularly when considered in light of the specification noted above.

The patents distinguish prior art devices with specific drivers for specific transmit/receive devices.  *See, e.g* ., '449 patent at 1:21-34.  They also teach that the interface must be "flexible to permit attachment of very different electrical or electronic systems to a host device by means of the interface...." *Id.* at 1:58-60.  Every embodiment disclosed in the patents has a separate interface device, and there is inadequate support under 35 U.S.C. 112 for anything but a separate interface device.   Casio also relies on the plain and ordinary meaning of these terms.

**"communication between" interpretation**:   "Communication Between" means two-way communication directly between the host and input/output device.

The "communication between" limitation is part of every claim of the '399 and '449 patents.  When properly construed, the T/R device and host must have two-way communication, not just data transfer from one to the other.  The word "between" requires two-way communication, and later language in the claims uses the words "from" and "to" showing a contrast with the "between" language used for this communication.  *Cf. e.g.*, "a data request command from the host device to the type of input/output device..." and "transfer of the digital

data to the host device." This language also shows that communication between the host and

T/R device must be bi-directional (commands from the host and data transfer from the T/R

device, i.e., if the host requests the data, the T/R device must be able to send data in response

thereto). There must be an interchange or exchange of data, as claimed and as plainly taught in

the specification. *See, e.g.,* the abstract ("communication between"); '399, 1:13-17

(distinguishing data acquisition and two-way communication).

The '449 patent, at 4:46-62, also discusses first that data must be "acquired, and

transferred to the host device," and in the very next sentence distinguishes that from

communication: "The data transmit/receive device itself can also communicate actively with the

host device." The communication is described as something different from an intermediate

memory merely storing and then sending on data to the host, and it requires, as the claims state,

actual communication between the T/R device and the host computer. *See also,* 5:55-67 (the

host computer user reading data "from the data transmit/receive device . . ." and discussing the

interface function of transferring data "from the data transmit/receive device . . . to the host

device . . . ."). The patents distinguish the claimed communication between the host and T/R

device from "communication between the host device and interface device" ('449 patent, at 6:13-

15). Casio also relies on the plain and ordinary meaning of these terms.

<u>No Infringement</u>

The Casio cameras are not and do not have Interface Devices as properly construed, as

they have no separate interface, and they have nothing with the ability to regulate a plurality of

interchangeable devices. The Casio cameras also do not have two way communications between

the host device and interface device. Accordingly, these elements provide two reasons why there

is no infringement. With regard to equivalents, that has not been asserted by Papst. See also

Casio's first response.

**B.    a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and**

**Interpretation** : "Host Device" means a separate and distinct hardware component from the

interface device or the data transmit/receive device. The host device must include software

drivers for input/output devices that are connected to the interface device and "customary in a

host device" (see below), and also drivers for a multipurpose interface. Casio also relies on the

plain and ordinary meaning of these terms.

**"customary" interpretation:** The term "customary" in the context of the '399 and '449 patents

is vague and unsupported for any interpretation other than for "drivers for hard disks, for

graphics devices or for printer devices ... [or] other storage devices such as floppy disk drives,

CD-ROM drives or tape drives." In any event, there is nothing in the patents that suggests that

cameras would be "customary". See '449 patent 3:30-43. Indeed the word camera never appears

in the patent specification at all.

<u>No Infringement</u>

The Casio cameras do not have host devices as properly construed. They are sold as

stand-alone cameras. Casio cameras also have nothing to do with any "customary" drivers for

hard disks, for graphics devices or for printer devices or other storage devices such as floppy

disk drives, CD-ROM drives or tape drives. With regard to equivalents, that has not been

asserted by Papst. See also Casio's first response.

**C.    a data transmit/receive device comprising the following features:**

**Interpretation** : "Data Transmit/Receive Device" means a distinct piece of hardware separate

from an Interface Device capable of providing and/or receiving analog data directly to and/or

from a host device through the separate Interface Device. The Data Transmit/Receive Device must transmit and receive information in the same form.

A Data Transmit/Receive Device limitation is part of every claim of the '399 and '449 patents. A "T/R" device would be understood by a person of ordinary skill in the art to mean a device that transmits and receives information in the same form. Moreover, if the patentee had meant that different types of data could be transmitted and received, the claim could have said "a transmit device and a receive device" and these could have transmitted and received different types of data. A data/transmit device is not a device for converting data from one form to another. Further, one of ordinary skill in the art would recognize that the claim itself requires that the data format of the communication be analog, as opposed to digital. Casio also relies on the plain and ordinary meaning of these terms.

No Infringement

Casio's digital cameras are unitary pieces of hardware without interface devices separate from data transmit/receive devices. Casio's digital cameras do not have any components that can both transmit and receive analog data, and the components alleged by Papst to meet these limitations do not transmit and receive data in the same form. With regard to equivalents, that has not been asserted by Papst. See also Casio's first response.

**D.     a processor;**

**Interpretation:** Processor means the microprocessor of a computer capable of receiving and executing logical instructions. Casio also relies on the plain and ordinary meaning of this term.

No Infringement

Casio does not dispute that its cameras have a processor, but does not infringe due to the many other missing claim elements. See also Casio's first response.

E.    **a memory;**

**Interpretation**:  Memory has its ordinary meaning, and includes any memory.  '449 patent, at 6:23-29.  Casio also relies on the plain and ordinary meaning of this term.

No Infringement

Casio does not dispute that its cameras have a memory, but does not infringe due to the many other missing claim elements.   See also Casio's first response.

F.    **a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and**

**Interpretation**:   "First connecting device" means the component of the interface device that electrically connects the host device to the separate interface device.   The first connecting device also allows direct, two way communication between the host device and the interface device.

No Infringement

Casio does not provide any host device with its digital cameras and so does not meet this element of the claim, and Papst has not asserted any indirect claims of infringement.   Moreover, as Casio has no "interface device" as properly interpreted, that provides another reason why this language is not met.  With regard to equivalents, that has not been asserted by Papst.  See also Casio's first response.

G.    **a second connecting device for interfacing the interface device with the data transmit/receive device,**

**Interpretation**:   This language means a component of the interface device that electrically connects a transmit/receive device to the separate interface device.   The second connecting device also must allow direct, two way communication between a transmit/receive device and the interface device.  Casio also relies on the plain and ordinary meaning of this phrase.

No Infringement

Casio's digital cameras have no second connecting device that electrically connects a transmit/receive device to a physically separate interface device. Casio's digital cameras also have no second connecting device that allows direct, two way communication between a transmit/receive device to the separate interface device. With regard to equivalents, Papst has not asserted infringement by equivalents. See also Casio's first response.

**H.    wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device,**

**Interpretation:** This term means that the processor and the memory built into the interface device together are responsible for the configuration of the interface device to provide the specific functionality described in the rest of the claim. This configuration must enable the interface device to be able to signal to the host that a storage device customary in the host device is attached to the interface device regardless of the type of transmit/receive device actually attached to the interface device.

The interface device must be configured by the processor and memory, which does not include simply downloading software into the camera from an external source. The requirement that the interface device interpreters be configured by the processor and memory is not only clear from the claim language, but also from the specification. *See, e.g.,* '449 patent, 4:6-10.

<u>No Infringement</u>

The processor in combination with the memory in Casio digital cameras do not configure anything to provide functionality to an interface device allowing a signal to be sent to a host that a storage device customary in the host device is attached to the interface device regardless of the

type of transmit/receive device actually attached to the interface device.   With regard to

equivalents, Papst has not asserted infringement by equivalents.  See also Casio's first response.

**I.      whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and**

**Interpretation:** This phrase means that the host device sends messages to the interface device

using a storage device driver that is "customary" in a host device.  The communication, through

the "customary" driver must occur regardless of the type of the data transmit/receive device

attached to the second connecting device of the interface device

The specific language "customary in a host device" is not capable of interpretation.   See

response to Interrogatory No. 2.

No Infringement

Casio's digital cameras can not be interpreted as customary devices, to the extent the term

is definable.  Casio's digital cameras are cameras and require drivers associated with cameras,

not storage devices.

**J.      wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure.**

**"virtual file system" interpretation**:  A file system that is not real, but instead simulates a hard

disk file system.

A virtual file system is described, for example, in the '449 patent at 4:67-5:2: the

interface device "simulates a hard disk with a root directory whose entries are 'virtual' files

which can be created for the most varied functions."  Also, as described in the '449 patent at

11:1-6 and the '399 patent at 11:66-12:4:  "Using the ASPI manager the interface device

according to the present invention can now obtain active access to an SCSI hard disk of the host

device connected to the same SCSI bus which, in contrast to the interface device, cannot be a

virtual but a real SCSI mass storage device or also a further interface device according to the

present invention." *See also*, '449 patent, 12:25-33, and the '449 prosecution history (e.g.,

5/17/04 Notice of Allowability).

No Infringement

The file system associated with photographic data in Casio's digital cameras is not

virtual, but is an actual file system associated with the storage of data on the internal memory

card of Casio's digital cameras.

**INTERROGATORY NO. 2:**       Describe in full and complete detail the bases for the
allegations in Casio's Complaint that the Patents-in-Suit are invalid for failing to comply with
the patent laws of the United States.

**OBJECTIONS**

Casio, Inc. objects to the deceptive nature in which this interrogatory was written.
Stating the interrogatory in this manner, and "defining" it to be wildly overbroad and to request
information not even remotely related to the request as written, is an obvious attempt to deceive
Casio into inadvertently waiving objections, or dupe the Court into thinking that Papst is being
reasonable in its requests. The request violates Federal Rule 26(g) as "defined" in the Papst
instructions, and Papst is hereby put on notice that, in the event this interrogatory is ever brought
before the Court, the full overbroad scope of what Papst seeks must be shown to the Court,
including the deceptive manner in which Papst attempted to get that information.
Casio objects to the definition provided to this interrogatory, as overbroad, unduly
burdensome, calling for irrelevant information not reasonably calculated to lead to the discovery
of admissible information, as calling for information that is subject to the attorney client
privilege, work product, or other immunity, calls for disclosure of confidential information to
Welsh & Katz, and calls for documents and information that are only relevant to the damages
and willfulness issues, which will be subject to Casio's motion to bifurcate. Casio will respond
only by considering the actual interrogatory recited above, and will provide information only for
the first independent claims of the patents as Papst has to date refused to (or has been unable to)
explain how the Casio cameras supposedly infringe on these patents. After receiving the Papst
analyses, Casio will provide reasonable detail on the reasons for its defenses. All other requests
are overly broad, unduly burdensome and calls for information that is irrelevant and not
reasonably calculated to lead to the discovery of admissible evidence.
Casio reserves its right to supplement this response as the case proceeds, including but
not limited to supplementation after the Court construes the claims, and upon learning Papst's
proposed constructions and contentions which, to date, Papst has been unable to provide.
Casio objects to this Interrogatory as improperly being characterized as one interrogatory
because its many subparts constitute separate interrogatories. See Fed. R. Civ. P. 33(a).
Subject to its general and specific objections, Casio responds as follows.

**FIRST RESPONSE:**

The claims of the Papst patents, particularly if read broadly enough to cover any Casio camera, would be invalid under at least 35 U.S.C. sections 112, 102, and 103. Unfortunately, despite this Court's order that discovery proceed and Papst's obligation to provide this information, Papst has refused to (or been unable to) provide claim constructions and analyses as to how these patents could possibly be read broadly enough to cover the Casio cameras. If and when Papst does so, Casio will show how the Papst claim constructions cannot read on the Casio cameras without also encompassing the prior art and otherwise rendering the patents invalid.

**SUPPLEMENTAL RESPONSE**

**Section 112 and the Papst proposed interpretations**

If any of the Papst claim constructions are seriously considered, then those terms are indefinite as the true interpretation is far different and Papst could not have particularly pointed out or distinctly claimed the invention. Further, it appears that if Papst were to sufficiently set forth its proposed claim constructions such that its claims could read on digital cameras, they would likely be refutable based on statements made during the prosecution of the Papst patents. *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473 (Fed. Cir. 1998). Moreover, if those extremely broad interpretations are accepted, then the claims are invalid for lack of enabling disclosures and failure to satisfy the written description requirements. As none of the Papst claim constructions are correct, however, Casio simply reserves its right to argue these issues if any one or more of the interpretations is seriously considered by the Court. The support for all these arguments is found in the response and supplemental response to Interrogatory 1. That is, the patent specifications clearly teach that the Casio interpretations are correct, and if another interpretation is seriously considered then the specifications do not enable that broad scope or show that the alleged inventor was in possession of that broad scope. Please see the responses to Interrogatory 1.

## Section 112 and "customary"

All the claims require that the interface device tell the personal computer that what is attached is a device "customary" in a host computer. The patent specifications and claims have no sufficient indication of the meaning of that term, of what might be included, and it provides no standard for how one would measure what is or is not "customary" to a host. Indeed, there is no standard "host" in the claims that could even serve as a basis by which to attempt to judge this "customary" language.

The specifications and prosecution history provide no guidance as to what devices might be considered "customary" in a host, and particularly in situations like the present case where there is close prior art, the claims should be properly declared invalid.

## Prior Art

Casio strongly disagrees with the Papst claim analysis. The following claim charts show, however, that even if Papst could read the claims on the Casio cameras, the prior art would invalidate those claims. Papst has refused, despite multiple court orders, to provide its proposed claim interpretations, and so it is not possible to properly compare the Papst analysis to the prior art. However, for these prior art references, there is no difference from the accused cameras insofar as these patent claims are concerned. Because Papst failed to comply with the Court orders and provide its proposed interpretations, we are forced to use the Papst language attempting to apply the claim language to the Casio cameras. Casio reserves the right to supplement this response should Papst ever fulfill its discovery obligations and comply with the Court orders.

1. **Prior art against the '399 patent (priority date 3/4/97, Germany)**

   **a. US Patent No. 6,088,532**

   This patent was filed in the US on 12/29/95 and is 102(e) art (its Japanese priority

application, published on 7/23/96, is 102(b) art).  Figures 30-31 and Col. 22, line 15-col. 23, line

43 of the '532 patent teach an embodiment where a camera itself incorporates an interface device

between a computer and a hard disk.  When the "external hard disk" mode is set, the digital

camera is used as an external memory for the computer.  The computer first issues a standard

"INQUIRY" SCSI command and the camera outputs data indicating it is now used as a hard

disk.  The computer can then issue other standard SCSI command such as "READ CAPACITY"

and "FORMAT UNIT" to the camera to control and hard disk (see 23:30-43).

   The '532 patent would invalidate by anticipation the '399 patent based on Papst's analysis

as far as it can be understood, while Papst still refuses to provide claim interpretations.

   See the Claim Chart Comparing the '399 patent and the '532 Patent below:

| Claim 1 of the '399 Patent | US Patent No. 6,088,532 (the '532 Patent) |
|---|---|
| 1. An interface device for communication between | The '532 patent includes an "interface device" that is formed by at least a portion of the CPU (included in the system control circuit **20)** and the on-chip memory **64** that are part of the camera (see Figures 2, 30 and 6:7-10). |
| A host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and | The '532 camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices. The PC has at least one SCSI port, which is a multi-purpose interface.  (see Figures 1 and 30, 22:15-32, 23: 7-10 (mentioning SCSI interface)).  As for the required driver for devices "customary" in a host, Papst fails to provide that interpretation. |

| | |
|---|---|
| A data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising: | The '532 camera includes a "data transmit/receive device" formed at least in part by a lens **12** and the diode array formed in a CCD chip **44** that converts light into analog data that is representative of an image (see Figures 2, 30 and 6:11-7:3). |
| A processor; | The '532 patent includes system control circuit **20** that includes a microprocessor (see 6:7-10). |
| A memory; | The camera also has a memory **64** for storing the digitized image data (see Fig. 30). The system control circuit **20** also includes on-chip memory that stores the programs used by the microprocessor. |
| A first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The '532 camera includes an output terminal **17**, which can be a SCSI socket that can be connected to a SCSI port of a personal computer by a SCSI cable (see Fig. 30 and 23:7-10). The '532 camera also includes a SCSI interface that is located on the camera. The "first connecting device" is formed by at least the SCSI socket, the SCSI interface on the camera, and the electrical connection between the two. |
| A second connecting device for interfacing the interface device with the data transmit/receive device, | The '532 camera includes a CCD chip **44** having a gates and registers block for sampling the analog data provided by the CCD as well as an analog-to-digital converter **62** and a CCD controller **47** for converting data sampled by the sampling circuit into digital data (see Figures 2, 30 and 6:66-7:42). The a/d converter, the gates and registers block, and the CCD controller form at least a portion of the "second connecting device." |
| the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and | The '532 camera includes a gates and registers block that forms a part of a CCD chip **44** and a CCD controller **47** that forms a part of a CCD controller chip. At least the gates and registers block and the CCD controller form at least a portion of a "sampling circuit." |

| An analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | The '532 camera includes an a/d converter **62**. The a/d converter **62** converts the analog data supplied to it from the gates and registers block into digital data that is representative of an image (see Figures 2, 30 and 6:66-7:42). |
|---|---|
| wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter, | An instruction set is programmed into the on-chip memory of the system control circuit **20** of the '532 camera (see 6:7-10). At least a portion of the instruction set forms a "first command interpreter" and a "second command interpreter". |
| wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, | The output terminal **17** of the '532 camera is adapted to receive inquiry signals that the computer sends to its SCSI port to determine when something is operatively coupled thereto. The "first command interpreter" is adapted to cause the microprocessor on the '532 camera to send, after the output terminal is coupled to the PC's SCSI port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera to the PC's SCSI port. (see 22:15-32, 23: 7-43).

When the '532 camera is in the "external hard disk mode", the response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver for the hard disk (see 23:30-44). |
| whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and | When the '532 camera is in the "external hard disk mode", the instruction set stored in the on-chip memory of the '532 camera is adapted to utilize a software driver for the hard disk to communicate with the PC. |
| wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | The output terminal 17 of the '532 camera is adapted to receive data request commands that the PC sends through the SCSI port. The "send command interpreter" is adapted to cause the microprocessor to interpret a data request command from the PC as being a command to initiate a transfer of digital data to the PC. The digital data can include digitized still pictures (see 23:30-43). |

### b. Casio QV-10

The Casio QV-10 camera was first on sale in the US more than one year before the

earliest priority date of the '399 patent, and it is thus 102(b) art.   It can be connected to a

computer through the standard RS-232C interface (pp. 78 of QV-10 user manual, bates-

numbered CAP-010511 - CAP-010533).  When connected, a user may use the interface provided

by the "QV-LINK" software to retrieve images stored in the camera's memory (pps 6, 13-14 and

18-19 of the QV-LINK Owner's manual).  Thus, to the extent that Papst contends that the

accused products meet the claim language, and although we are unable to compare the Papst

interpretations with the prior art due to Papst's refusals to comply with the Court orders, there is

not reasonable distinction between the accused cameras and this prior art insofar as these patents

are concerned.

See the Claim Chart Comparing the '399 Patent and QV-10 below:

| Claim 1 of the '399 Patent | Casio QV-10 Digital Camera |
| --- | --- |
| 1. An interface device for communication between | The QV-10 camera includes an interface device that is formed by at least a portion of the CPU and the on-chip memory that are part of the camera. |
| a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and | The QV-10 camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices. The PC has at least a RS-232C interface (pp. 78 of QV-10 user manual), which is a multi-purpose interface. |
| a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising: | The QV-10 camera includes a "data transmit/receive device" formed at least in part by a lens and the diode array formed on a CCD chip that converts light into analog data that is representative or an image. |
| a processor; | The QV-10 camera includes a processor (CPU). |
| a memory; | The QV-10 camera includes an on-chip |

| | memory that is located on the camera. The on-chip memory forms at least a portion of the claimed "memory." |
|---|---|
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The QV-10 camera includes a socket that can be connected to a RS-232 port of a personal computer by a cable (pp. 78 of QV-10 user manual). The "first connecting device" is formed by at least the socket, the RS-232 interface on the camera, and the electrical connections between the two. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The QV-10 camera includes a CCD chip having a gates and registers block, as well as a CCD controller. At least the a/d converter, the gates and resisters block, and the CCD controller form at least a part of a "second connecting device." |
| the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and | The QV-10 camera includes a gates and registers block that forms a part of a CCD chip and a CCD controller that forms a part of a CCD controller chip. At least the gates and registers block and the CCD controller form at least a portion of a first "sampling circuit." |
| an analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | The QV-10 camera includes an a/d converter that converts the analog data supplied to it from the gates and registers block into digital data that is representative of an image. |
| wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter, | An instruction set is programmed into the memory of the QV-10 camera. At least a portion of the instruction set forms a "first command interpreter" and a "second command interpreter". |
| wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, | The socket of the QV-10 camera is adapted to receive inquiry signals that the PC sends to its port to determine when something is operatively connected thereto. The "first command interpreter" is adapted to cause the processor on the QV-10 camera to send, after it is coupled to the PC's RSC-232 port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera. The response signal contains information that, when received and processed by the PC, causes the PC to recognize that it |

|  | can communicate with the "interface device" by means of a software driver for a device that stores digital images. |
|---|---|
| whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and | The computer communicates with the QV-10 camera by means of the QV-LINK driver software to allow the "interface device" to communicate with the PC. |
| wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | A user may use the interface provided by the "QV-LINK" software to view the images stored in the QV-10 camera's memory in a directory structure and retrieve the image files (pps 6, 13-14 and 18-19 of the QV-LINK Owner's manual). The QV-10 camera includes a second command interpreter that is adapted to cause the processor of the QV-10 camera to interpret a data request command from the PC as being a command to initialize a transfer of digital data to the PC. The digital data can include digitized pictures. |

### c. The Kodak DCS 200

The Kodak DCS 200 camera was first on sale in the US around 1992-93 and is thus

102(b) art. It can be connected to a computer through the standard SCSI interface (pp. 5-10

through 5-11 of Kodak DCS description, bates-numbered CAP-22804-805). Like the QV-10, it

needs a software driver to retrieve images stored in the camera's memory (Id.). To the extent

Papst asserts that the claims cover the accused cameras, they would also cover this prior art.

See the Claim Chart Comparing the '399 Patent and Kodak DCS 200 below:

| Claim 1 of the '399 Patent | Kodak DCS 200 Digital Camera |
|---|---|
| 1. An interface device for communication between | The DCS200 camera includes an interface device that is formed by at least a portion of the CPU and the on-chip memory that are part of the camera. |
| a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and | The DCS200 camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices. |

| | The PC has at least a SCSI (pp. 8 of Kodak DCS description), which is a multi-purpose interface. |
|---|---|
| a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising: | The DCS200 camera includes a "data transmit/receive device" formed at least in part by a lens and the diode array formed on a CCD chip that converts light into analog data that is representative or an image . |
| a processor; | The DCS 200 camera includes a processor (CPU). |
| a memory; | The DCS 200 camera includes an on-chip memory that is located on the camera.  The on-chip memory forms at least a portion of the claimed "memory." |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The DCS200 camera includes a socket that can be connected to a SCSI interface of a person computer by a cable (pp. 8 of Kodak DCS description).  The "first connecting device" is formed by at least the socket, the SCSI interface on the camera, and the electrical connection between the two. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The DCS200 camera includes a CCD chip having gates and registers block, as well as a CCD controller chip that includes an a/d converter and a CCD controller.  At least the a/d converter, the gates and register block, and the CCD controller form at least a part of a "second connecting device."  The sample circuit and the a/d converter form at least a portion of the "second connecting device." |
| the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and | The DCS200 camera includes a gates and registers block that forms a part of a CCD chip and a CCD controller that forms a part of a CCD controller chip.  At least the gates and registers block and the CCD controller form at least a portion of a first "sampling circuit." |
| an analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | The DCS200 camera includes an a/d converter that converts the analog data supplied to it from the gates and registers block into digital data that is representative of a image. |

| wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter, | An instruction set is inherently programmed into the on-chip memory of the DCS200 camera. At least a portion of the instruction set forms a "first command interpreter" and a "second command interpreter". |
|---|---|
| wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, | The socket of the DCS200 camera is adapted to receive inquiry signals that the PC sends to its port to determine when something is operatively connected thereto. The "first command interpreter" is adapted to cause the processor on the DCS200 camera to send, after it is coupled to the PC's SCSI port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera. The response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver for a device that stores digital images. |
| whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and | The computer communicates with the DCS200 camera by means of the DCS200 driver software to allow the "interface device" to communicate with the PC. |
| wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | A user may use the interface provided by the driver software to view the images stored in the DCS 200 camera's memory in a directory structure and retrieve the images files. The DCS200 camera inherently includes a second command interpreter that is adapted to cause the processor of the DCS200 camera to interpret a data request command from the PC as being a command to initialize a transfer of digital data to the PC. The digital data can include digitized pictures. |

**2. Prior art against the '449 patent (priority date 3/4/97, Germany)**

The '449 patent is a continuation of the '399 patent.

**a.    Claim Chart Comparing the '449 patent and the '532 Patent**

| Claim 1 of the '449 Patent | US Patent No. 6,088,532 (the '532 Patent) |
|---|---|
| 1. An interface device for communication between | The '532 patent includes an "interface device" that is formed by at least a portion of the CPU (included in the system control circuit **20**) and the on-chip memory **64** that are part of the camera (see Figures 2, 30 and 6:7-10). |
| a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and | The '532 camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices. The PC has at least one SCSI port, which is a multi-purpose interface.  (see Figures 1 and 30, 22:15-32, 23: 7-10 (mentioning SCSI interface)).  As for the required driver for devices "customary" in a host, Papst fails to provide that interpretation. |
| a data transmit/receive device comprising the following features: | The '532 camera includes a "data transmit/receive device" formed at least in part by a lens **12** and the diode array formed in a CCD chip **44** that converts light into analog data that is representative or an image (see Figures 2, 30 and 6:11-7:3). |
| a processor; | The camera includes system control circuit **20** that includes a microprocessor (see 6:7-10). |
| a memory; | The camera also has a memory **64** for storing the digitized image data (see Fig. 30).  The system control circuit **20** also includes on-chip memory that stores the programs used by the microprocessor. |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The '532 camera includes an output terminal **17**, which can be a SCSI socket that can be connected to a SCSI port of a person computer |

| | by a SCSI cable (see Fig. 30 and 23:7-10). The '532 camera also includes a SCSI interface that is located on the camera. The "first connecting device" is formed by at least the SCSI socket, the SCSI interface on the camera, and the electrical connection between the two. |
|---|---|
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The '532 camera includes a CCD chip **44** having a gates and registers block for sampling the analog data provided by the CCD as well as an analog-to-digital converter **62** and a CCD controller **47** for converting data sampled by the sampling circuit into digital data (see Figures 2, 30 and 6:66-7:42).   At least, the a/d converter, the gates and registers block, and the CCD controller form at least a portion of the "second connecting device." |
| wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device, | The SCSI socket of the '532 camera is adapted to receive inquiry signals that the PC sends to its SCSI port to determine when something is operatively coupled thereto.  An instruction set is programmed into the on-chip memory of the camera of the '532 camera.  The instruction set is adapted to cause the CPU on the camera to send, after the SCSI socket is coupled to the PC's SCSI port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera and audio chip to the PC's SCSI port.<br><br> When the '532 camera is in the "external hard disk mode", the response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver for a disk drive, which is an input/output device customary in a computer (see 22:15-32, 23: 7-44). |
| whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and | When the '532 camera is in the "external hard disk mode", the instruction set stored in the on-chip memory of the '532 camera is inherently adapted to utilize a software driver for hard disk to communicate with the PC. |
| wherein the interface device is arranged for simulating a virtual file system to the host, the | The instruction set stored in the on-chip memory of the '532 camera is adapted to store |

| | |
|---|---|
| virtual file system including a directory structure. | pictures in a file system and a directory structure defined in its memory. The file system is "virtual" – the digitized pictures being representatives of images. |

**b.    Claim Chart Comparing the '449 Patent and QV-10**

| Claim 1 of the '449 Patent | Casio QV-10 Digital Camera |
|---|---|
| 1. An interface device for communication between | The QV-10 camera includes an interface device that is formed by at least a portion of the CPU and the on-chip memory that are part of the camera. |
| a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and | The QV-10 camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices. The PC has at least a RS-232C interface (pp. 78 of QV-10 user manual), which is a multi-purpose interface. |
| a data transmit/receive device comprising the following features: | The QV-10 camera includes a "data transmit/receive device" formed at least in part by a lens and the diode array formed on a CCD chip that converts light into analog data that is representative or an image. |
| a processor; | The QV-10 camera includes a processor (CPU). |
| a memory; | The QV-10 camera includes an on-chip memory that is located on the camera. The on-chip memory forms at least a portion of the claimed "memory." |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The QV-10 camera includes a socket that can be connected to a RS-232 port of a personal computer by a cable (pp. 78 of QV-10 user manual). The "first connecting device" is formed by at least the socket, the RS-232 interface on the camera, and the electrical connections between the two. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The QV-10 camera includes a CCD chip having a gates and registers block, as well as a CCD controller chip that includes an a/d converter and a CCD controller. At least, the a/d converter, the gates and registers block, and the CCD controller form at least a portion of the "second connecting device." |

| | |
|---|---|
| wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device, | The socket of the QV-10 camera is adapted to receive inquiry signals that the PC sends to its port to determine when something is operatively connected thereto. An instruction set is programmed into the on-chip memory of the camera. The instruction set is adapted to cause the processor on the QV-10 camera to send, after it is coupled to the PC's RSC-232 port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera. The response signal contains information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver for a device that stores digital images. |
| whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and | The instruction set stored in the on-chip memory of the QV-10 camera is adapted to utilize a software driver to allow the "interface device" to communicate with the PC. |
| wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure. | The instruction set stored in the on-chip memory of the QV-10 camera is adapted to store pictures in a file system and a directory structure defined in its memory. The file system is "virtual" -- the digitized pictures being representatives of images. After the socket of the QV-10 camera is coupled to a RSC-232 port on a PC, a representation of all of the digitized analog data that are stored in the memory is shown on the screen of the PC as being contained in a file folder (pps 6, 13-14 and 18-19 of the QV-LINK Owner's manual). |

    **c.**    **Claim Chart Comparing the '449 Patent and Kodak DCS 200**

| Claim 1 of the '449 Patent | Kodak DCS 200 Digital Camera |
|---|---|
| 1. An interface device for communication between | The DCS200 camera includes an interface device that is formed by at least a portion of the CPU and the on-chip memory that are part of the camera. |

| a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and | The DCS200 camera can be connected to, for example, a personal computer that utilizes drivers for a variety of input/output devices. The PC has at least a SCSI (pp. 8 of Kodak DCS description), which is a multi-purpose interface. |
|---|---|
| a data transmit/receive device comprising the following features: | The DCS200 camera includes a "data transmit/receive device" formed at least in part by a lens and the diode array formed on a CCD chip that converts light into analog data that is representative or an image . |
| a processor; | The DCS 200 camera includes a processor (CPU). |
| a memory; | The DCS 200 camera includes an on-chip memory that is located on the camera. The on-chip memory forms at least a portion of the claimed "memory." |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The DCS200 camera includes a socket that can be connected to a SCSI interface of a person computer by a cable (pp. 8 of Kodak DCS description). The "first connecting device" is formed by at least the socket, the SCSI interface on the camera, and the electrical connection between the two. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The DCS200 camera includes a CCD chip having a gates and registers block, as well as a CCD controller chip that includes an a/d converter and a CCD controller.   At least, the a/d converter, the gates and registers block, and the CCD controller form at least a portion of the "second connecting device." |
| wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device, | The socket of the DSC200 camera is adapted to receive inquiry signals that the PC sends to its port to determine when something is operatively connected thereto.  An instruction set is programmed into the on-chip memory of the camera.  The instruction set is adapted to cause the processor on the DCS200 camera to send, after it is coupled to the PC's SCSI port, and after an inquiry signal has been received and processed, a response signal comprising data stored in the on-chip memory defined in the camera.  The response signal contains |

| | information that, when received and processed by the PC, causes the PC to recognize that it can communicate with the "interface device" by means of a software driver for a device that stores digital images. |
|---|---|
| whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, | The instruction set stored in the on-chip memory of the DCS200 camera is adapted to utilize a software driver to allow the "interface device" to communicate with the PC. |
| and wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure. | The instruction set stored in the on-chip memory of the DCS200 camera is adapted to store pictures in a file system and a directory structure defined in its memory. The file system is "virtual" – the digitized pictures being representatives of images. |

DATED:  June 22, 2007

Jeffrey M. Gold *(pro hac vice)*
Morgan Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178

J. Kevin Fee (Bar. No. 494016)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004

Scott D. Stimpson, Esq. (*pro hac vice*)
The Law Office of Scott D. Stimpson
445 Hamilton Avenue, 11th Floor
White Plains, New York 10601
Tel. 203-258-8412

Attorneys for Plaintiff and Counter Defendant
Casio Inc. and Counter Defendant
Casio Computer Co., Ltd.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing CASIO INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PAPST LICENSING GMBH & CO. KG'S FIRST SET OF INTERROGATORIES TO CASIO INC. was served on this, the 22nd day of June, 2007, upon the attorneys for Papst as follows:

**VIA U.S. MAIL and E-MAIL**
Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza • 22nd Floor
Chicago, Illinois 60606

Campbell Killefer (Bar No. 268433)
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4000

Attorneys for Defendant/Counter-Plaintiff,
Papst Licensing GmbH & Co. KG

EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASIO INC.

                  Plaintiff,

        v.

PAPST LICENSING GMBH & CO. KG,
                  Defendant.

_____

PAPST LICENSING GMBH & CO. KG,
Counter-Plaintiff

v.

CASIO INC. and
CASIO COMPUTER CO., LTD.

Counter-Defendants

Civil Action No. 1:06 CV 01751

Judge: Gladys Kessler

Magistrate Judge: Robinson

Next Court Deadline: Written Discovery
Requests by July 1, 2007

## PAPST 'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

Campbell Killefer (Bar No. 268433)
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4000

Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza,
22nd Floor
Chicago, IL 60606
(312) 655-1500
*Attorneys for Papst Licensing GmbH & Co. KG*

# I. MOTION

Papst Licensing GmbH & Co. KG ("Papst"), pursuant to Fed.R.Civ.P. 37(a), moves this Court for an order compelling Casio Inc. ("Casio US") and Casio Computer Company, Ltd. ("Casio Japan") to respond to Papst's first set of document requests served upon Casio US and Casio Japan.  Casio should be compelled to produce documents in response to the following document requests in connection with the Casio Digital Cameras (as that term has been defined by Papst):

| Request Nos. | General Subject Matter[1] |
|---|---|
| 1, 12 | Identity of potentially infringing products |
| 13-14 | Agreements relating to the cameras |
| 2-5, 10-12 | Technical aspects, properties and development of the cameras |
| 15, 17-18 | Prior litigation involving the cameras |
| 23-26 | Licensing of the cameras |
| 7, 19-22, 27-30 | Revenues, purchase, sales, costs, profits, and customer communications concerning the cameras |
| 31-33 | Transfer of rights, financial impact, and market studies relating to the cameras |
| 34 | Employees involved with patent work related to cameras |
| 35-37 | Marketing and advertising relating to the cameras |
| 38-9, 44, 47-52, 55, 74 | The patents in suit |
| 40-43 | Casio's claims and defenses |
| 45-46, 50-54, 63-65 | Casio's infringement and potential liability; validity of patents |
| 56-58, 66-67 | Casio's corporate structure and involvement of related companies |
| 62 | Expert testimony |
| 68-69 | Casio's document retention policies |
| 70 | Casio's information systems |
| 71-73 | First set of interrogatories, joint defense agreements, Papst |

# II. FACTS

On April 20, 2007, Papst served its First Set of Requests for Production of Documents and Things upon Casio US and Casio Japan. (Exs. A and B.)  On May 21, 2007, Casio US and Casio Japan served their objections and responses to the document requests.  (Exs. C and D.) (Because the document requests and responses thereto are virtually identical for both Casio

---

[1] For a much more detailed explanation as to how each individual Document Request relates to the issues in this lawsuit, *see* Exhibit G.

entities, Casio US and Casio Japan will be treated as a single entity ("Casio") for purposes of this motion.) Casio objected to the discovery responses on the basis of relevance, undue burden, privilege, work product and confidentiality, among others. For example, Casio refuses to produce documents because Casio has interpreted the requests in the broadest possible sense in order to render the requests "overly broad;" will only produce very limited categories of technical documents; will only produce documents relating to Casio cameras "specifically accused of infringement by Papst;" and will not produce other categories of documents because it "may" move to disqualify Welsh & Katz and may move to bifurcate. The parties have had multiple discovery conferences and Papst has further narrowed its requests in order to resolve this issue, but to date, Casio has provided relatively few documents, consisting of publicly-available user manuals for its cameras, and some marketing and advertising materials.

### III. ARGUMENT

By way of background, Casio attempts to evade its discovery obligations by placing the broadest possible interpretation on the document requests, then refusing to answer the requests on the grounds that they are overly broad and unduly burdensome. In fact, Casio outright refused to produce any documents in response to Request nos. 14-15, 17-18, 21-23, 25-26, 30-32, 34, 37, 48, 55-60, 62-64, and 66-67 even though these requests sought the production of relevant documents. However, as stated by the Advisory Committee on the 1993 amendments to Rule 37, "requests for production should not be read or interpreted in an artificially restrictive or hyper technical manner to avoid disclosure of information fairly covered by the discovery request, and to do so is subject to appropriate sanctions . . .." Fed.R.Civ.P. 37(a) advisory committee's note (1993). Casio's blanket refusal to provide clearly relevant documents on manufactured claims of over breadth should be rejected by this Court, especially where Papst has refined its requests in discovery conferences. It should not be forgotten that Casio is the party

that instituted this patent infringement suit, and having done so, Casio should be prepared to

spend the time that will be required to locate and produce the documents properly requested by

Papst.  Casio's refusal to produce even the most basic documents required in any patent

infringement suit should not be countenanced.

### A.  Casio Must Produce Discovery On The Research, Development, Design, Testing, Manufacturing, And Operation Of The Casio Digital Cameras (Request Nos. 2-5, 10-12)

Papst asked Casio to produce documents relating to research, design, development,

testing, manufacturing, and operation of the Casio Digital Cameras. (Document Request Nos. 2-

5, 11-12, Exs. A, B.)  During discovery negotiations, Papst further narrowed these requests to the

following aspects of the Casio Digital Cameras that directly concern the subject matter of the

claim elements of claim 1 of Patent No. 6,470,399 ("'399 Patent"):

1.  The acquisition and processing of light images by cameras including, for example, the conversion of light images into electrical signals representative of the light images.
2.  The processing by a camera of electrical signals representative of light images including, for example, the conversion of analog signals representative of light images into digital electrical signals, and the transfer of those digital electrical signals to an electronic memory.
3.  The operation of any computer program stored in a memory of a camera as it concerns any of the other subject matters set forth in this list.
4.  The storage of information in a memory of a camera, including but not limited to external memory cards and other electronic memory intended to be attached to a camera.
5.  The interconnection of a camera to a personal computer.
6.  The transfer of digital electrical signals representative of light images from a camera to a personal computer including, for example, the process by which the personal computer recognizes how to communicate with and receive data from the camera.
7.  The process by which a camera communicates with and transfers information to or from a personal computer.
8.  The acquisition and processing of sound waves by cameras, how the sound waves are converted to digital electrical signals by the camera, how those digital electrical signals are processed and stored by the camera, and how those digital electrical signals are downloaded from the camera to a personal computer.

(Attached Exhibit E.  *See also* Exhibit F, which contains examples of how the above-listed

categories directly relate to the claims of the '399 patent in suit.)  Casio, however, still refuses to

3

produce the requested documents, and will only produce "documents sufficient to show the **designs** and **operations** of the Casio Cameras that Papst specifically accuses of infringement, as well as all user and service manuals for those cameras." (Response to Request No. 2, Ex. C.) Case law is clear that Casio must provide all relevant documents in response to the requests for technical information of the subject cameras. *Ropak Corp. v. John W. Von Holdt*, 2006 U.S. LEXIS 19912, * 9-10 (N.D. Ill. April 17, 2006 ("Documents relating to the concept, design and manufacturing of allegedly infringing products are relevant …product features are defined during the concept, design and manufacturing process… the Court grants [the patentee's] motion to compel…."); *Alloc, Inc. v. Unilin Beheer B.V.*, 2006 U.S. Dist. LEXIS 24148 (D. Wis. 2006)(granting motion to compel research and development documents). Accordingly, Casio should be ordered to produce documents responsive to Request Nos. 2-5 and 11-12, as further narrowed by Papst.

**B.    Casio Must Produce Documents For Products That May Yet Be Accused Of Infringement (Request Nos. 2-7, 11-12, 19-20, 28-29, 35-36, 40, 46, 52)**

In its document requests, Papst seeks discovery relating "Casio's Digital Cameras." This term has been defined by Papst (in its requests and subsequent discussions with Casio) as all Casio digital cameras "capable of transferring picture data to another device" (the technology disclosed in the patents in suit), which were used, manufactured, sold, offered for sale, licensed or imported into the United States since October 22, 2002. (Ex. A p. 4 par. 10.) Casio, however, has only agreed to produce discovery in connection with six Casio cameras "specifically accused of infringement by Papst." Responses to Request Nos. 2-7, 11-12, 19-20, 28-29, 35-36, 40, 46, 52 (Ex. C). Because the patents-in-suit are directed, in part, toward the internal operation of the camera, which is not apparent from a physical inspection, full discovery is required on the internal operation of each **potentially** infringing Casio Digital Cameras to verify infringement.

4

*E.I. Dupont De Nemours v. Phillips Petroleum Co.*, 24 F.R.D. 416, 426 (D.Del. 1959) ("plaintiff is entitled to know which products the defendants or its licensees manufacture which *may* infringe.") (emphasis added); *IP Innovation L.L.C. v. Sharp Corp.*, 219 F.R.D. 427, 429 (D. Ill. 2003)("The information sought by plaintiffs is relevant to their infringement allegations and specifically, to determining whether additional Sharp products or systems infringe."). Therefore, Casio should be ordered to produce all responsive documents concerning **all** Casio Digital Cameras as that term has been defined—not just those "specifically accused of infringement."

      **C.**    **Casio Cannot Refuse To Produce Documents Pending Some Future Motion To Bifurcate (Request Nos. 19-22, 27-34, 36-45, 47-51, 53-57, 62-67, 71, 73-74)**

Casio has refused to produce documents in connection with several topics (sales, profits, revenues, marketing, the patents in suit, Casio's claims and defenses, Casio's corporate structure, etc.) because, among other reasons, the documents sought "are only relevant to the damages and willfulness issues, which will be subject to Casio America's motion to bifurcate." Casio Responses to Nos. 19-22, 27-34, 36-45, 47-51, 53-57, 62-67, 71, 73-74, Ex. C. Absent an Order from this Court, Casio is obligated to comply with its discovery obligations, and it may not refuse discovery on these numerous topics because it may someday seek bifurcation on the issue of damages. Moreover, Casio has already sought to bifurcate twice and has been twice denied by the Court. Judge Kessler declined to adopt Casio's requested bifurcation in the Case Management Plan (Docket No. 28), and Magistrate Judge Robinson declined to adopt Casio's requested bifurcation at the May 31, 2007 hearing. (Docket No. 36). Accordingly, Casio should be ordered to respond to Request Nos. 19-22, 27-34, 36-45, 47-51, 53-57, 62-67, 71, 73-74.

      **D.**    **Casio Must Produce Documents Relating To Activities Outside of the U.S. (Request Nos. 7, 19, 20, 28, 29, 35, 36)**

In response to Papst's requests for documents relating to communications with customers, sales, revenues, profits, and marketing materials, Casio will only provide information

for certain activities within the United States. (See Response to Request Nos. 7, 19-20, 28, 29,

35, 36, Ex. C.) However, information concerning activities outside of the United States is still

relevant and must be produced because Casio is liable for infringing products even if they are

first sold outside the United States, if there is an expectation that the products will eventually be

indirectly sold to the United States market in any infringing manner. *See, Wing Shing Products,*

*Ltd. v. Simatelex Manufactory Co., Ltd.*, 479 F.Supp.2d 388, 409 (S.D.N.Y. 2007) (defendant's

knowledge that some infringing products manufactured outside of U.S. are destined for the U.S.

establishes the intent element of induced infringement); *MEMC Electronic Materials, Inc. v.*

*Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379 (Fed.Cir. 2005)(Japanese manufacturer

could be liable for inducement where it sold accused product to its Japanese subsidiary which in

turn sold it to its American subsidiary).

This evidence is also relevant because it bears on the issue of commercial success *Amsted*

*Industries, Inc. v. National Castings, Inc.*, 1989 U.S. Dist. LEXIS 7718, 2-3 (D. Ill.

1989)(*company wide* financial data should be compelled because it was relevant to the issue of

commercial success of the infringing products in relation to all other products). Therefore, Casio

must make a complete search and production of those documents that are responsive to Papst 's

Request to Produce Nos. 7, 19-20, 28, 29, 35, and 36.

### E.   Casio Cannot Withhold Documents On The Basis Of Confidentiality (Request Nos. 2-34, 36-67, 69-74)

In response to virtually all of Papst's document requests, Casio objected "to providing

any confidential documents to Welsh & Katz (**ever**) . . ." (Response Nos. 2-34, 36-67, 69-74,

emphasis added.) According to Casio, Welsh & Katz is "prosecuting patent applications it

intends to assert against the camera industry upon issuance," and Casio "**may** move to disqualify

the Welsh & Katz firm for this and other reasons." (Response p. 2, emphasis added.) However,

the bulk of documents that Casio is withholding on the basis of confidentiality have nothing to do with prosecution of the patents in suit, so there is no reason to withhold them based on the reasons stated.  And as for those confidential documents that do relate to patent prosecution, Welsh & Katz has agreed to isolate the single attorney dealing with the prosecution of relevant patents at its firm from documents that could have any relevance to the prosecution of the patents.  In fact, Papst has moved for the entry of a Protective Order that addresses Casio's concerns in this regard (even though Casio, as the objecting party, should have brought the issue to this Court's attention).  (*See* Doc. Nos. 49-50.)  Casio may not refuse to produce documents by claiming that it "may" some day move to disqualify counsel for Papst.

**F.    Casio Must Produce The Requested Documents On A Date Certain  (Request Nos. 38-39, 44-51, 53-55 and 74)**

In response to Papst Request Nos. 38-39, 44-51, 53-55 and 74, Casio has agreed to produce all responsive and non-privileged documents concerning the patents-in-suit, but has not agreed to a date for a production.  Papst requests this Court order that all documents that Casio has agreed to produce in its response and its meet and confer sessions or that Casio is ordered to produce should be produced within 10 calendar days of this Court's order.

**G.    Casio Must Produce All Other Relevant Documents**

Casio has refused to produce a number of categories of documents on the basis of relevance.  Hoever, "[a] request for discovery should be considered relevant if there is any possibility that the information sought may be relevant…The objecting party bears the burden of demonstrating why a particular discovery request is improper." *Alloc, Inc.,* 2006 U.S. Dist. LEXIS 24148 at 5-6.  As shown below, Casio must produce documents on the following categories, all of which are relevant and properly requested:

***Casio's Financial Documents (Request Nos. 19-22, 27-30).***   To date, Casio has

produced relatively few and certainly not all relevant documents regarding the sales, revenues,

profits, costs or licensing information for the Casio Digital Cameras, and it only offered to

eventually produce "summary records of sales to customers in the United States, for those

products specifically accused of infringement." (*See* Response to Request Nos. 19-22, 27-30).

Casio's financial documents are relevant because Papst is entitled to compensation to account for

Casio's alleged infringement and in no event less than a reasonable royalty. 35 U.S.C. § 284.

Among the factors that must be considered in determining a reasonably royalty (the so-called

"Georgia-Pacific" factors) are all of the sales *and* profitability information concerning the at-

issue products.[2]  These materials should be produced.

***Documents from all Casio entities (Request Nos. 24-25).*** Casio seeks to limit its

discovery to the named Casio parties. However, discovery is required from all Casio entities who

possess relevant information.  Casio's 2006 Annual Report states that Casio Japan is in control of

Yamagata Casio Co., Ltd., which is involved in the "production of digital cameras." (Ex. G p.

41.)  This report also demonstrates that Casio Japan is in control of twenty-seven other Casio

entities that likely possess relevant information. *Id*; *See also* 7-34 Moore's Federal Practice -

Civil § 34.14 ("The courts have frequently required a business entity party to produce documents

in the possession of its parent company, and conversely have required the parent to produce

documents possessed by its subsidiary.")  Papst has requested documents on the "legal control"

---

[2] *See, Georgia-Pacific Corp. v. U.S. Plywood*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970) (listing the relevant factors for determining a patent royalty, such as rates paid by the licensee for use of comparable patents; nature and scope of any license; licensor's policy and marketing program; commercial relationship between licensor and licensee; effect of selling patented specialty in promoting sales of licensee's other products; established profitability of product made under patent; utilitarian advantages of patent property over old modes or devices; nature of patented invention; extent to which infringer made use of the invention; portion of profit or selling price customary to allow for use of invention; portion of profit that should be credited to the invention, expert opinions, and amount a willing licensor would agree to pay for a license.); and *Parental Guide of Texas, Inc. v. Thomson, Inc.*, 446 F.3d 1265, 1270 (Fed. Cir. 2006) (*Georgia-Pacific* factors are proper standard for determining a reasonable royalty).

issue to show Casio Japan and Casio USA do have control over other Casio entities to produce documents, but Casio has improperly refused to produce any such documents. (*See* Response to Request No. 67, Ex. C.). All such documents should be produced.

*Documents regarding Casio computer information systems (Request No. 70 ).* Casio has agreed to only produce "a general overview of its electronic systems." (Ex. C., Request No. 70, p. 47-48). Casio is required, however, to describe the details of Casio's information systems, the types of electronic files that exist in its 250 gigabytes of potential electronic discovery, and those individuals with relevant knowledge of this information. This information is "reasonably calculated to lead to the discovery of admissible evidence," and should be produced. Rule 26(b)(1).

*Documents regarding other lawsuits (Request Nos. 15, 17-18).* Casio claims that documents relating to other lawsuits concerning Casio Digital Cameras are irrelevant. However, this discovery is relevant to, among other things, Casio's previous admissions on claim interpretations and the operation of its cameras, damages, and the existence of other relevant documents. *See, Alloc, supra* (granting motion to compel documents from the infringing party's other patent lawsuit concerning same products at issue). Indeed, there is at least one other lawsuit in which Casio was sued for patent infringement in connection with the Casio Digital Cameras at issue in this suit, in *St. Clair Property v. Canon Inc. et al.,* Case No. 03-00241-JJF (D. Del.). These documents should also be produced.

*Prior Art (Request No. 50, 51, 53).* In response to requests for information concerning prior art and other publications relating to the patents in suit and Casio's infringement of the patents in suit, Casio has only agreed to produce "prior art on which it intends to rely." (*See* Response to Request Nos. 50, 51, 53.) However, Casio may not restrict its responses just to those documents on which it intends to rely, but must produce all relevant responsive documents.

*See Rohm and Haas Co. v. Brotech Corp.*, 1990 U.S.Dist. LEXIS 20117 at *20 (D.Del. 1990) ("[A] defendant cannot simply claim noninfringement and limit discovery according to its view of the case.")

*Documents concerning Casio's communications with customers (Request No. 7).* Communications with Casio's customers concerning the Casio digital cameras are relevant on several issues and should also be produced. *See e.g., Alloc, supra* ("Customers' experiences, complaints, praises and/or returns may be indicative of the product's capabilities and limitations.")(granting motion to compel).

*Documents demonstrating the identity of individuals and businesses involved in Casio's infringing activities (Request Nos. 56-58, 66) and relating to First Set of Interrogatories (Request No. 71).* Casio refuses to produce any documents that will identify those businesses and individuals involved in Casio's infringing activities. (Responses to Request Nos. 56-58, 66 (Ex. C, pp. 39-40, 45).) Rule 26(b)(1) permits this discovery stating that "Parties may obtain discovery regarding any matter, … *including...the identity and location of persons having knowledge of any discoverable matter.*" Casio's further refusal to produce any documents relating to its interrogatory responses is also untenable. (Response to Request No. 71, Ex. C.) All responsive documents should be produced.

The page restraints do not permit Papst to go into detail describing the relevance of all of the document requests, but Papst has attached as Exhibit H a chart showing the areas of relevance of the different document requests, all of which should be responded to.

## IV.  CONCLUSION

On June 5 and 13, 2007, counsel for Papst met and conferred with counsel for Casio to discuss the above issues. Casio has stated that it will oppose any motion to compel. Therefore, Papst respectfully request this Court enter the Proposed Order attached hereto to this Motion.

Dated:  June 27, 2007                    /s/ Joseph E. Cwik
                                         Jerold B. Schnayer
                                         Joseph E. Cwik
                                         WELSH & KATZ, LTD.
                                         120 South Riverside Plaza • 22nd Floor
                                         Chicago, Illinois 60606
                                         (312) 655-1500

                                         Campbell Killefer (Bar. No. 268433)
                                         VENABLE LLP
                                         575 7th Street, N.W.
                                         Washington, D.C. 20004
                                         (202) 344-4000

                                         *Attorneys for Defendant/Counter-Plaintiff Papst
                                         Licensing GmbH & Co. KG*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon the following counsel for Plaintiff and Counterclaim Defendant Casio Inc. and Counterclaim Defendant Casio Computer Co., Ltd. through the Court's ECF electronic service, this 27th day of June, 2007:

J. Kevin Fee
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004

Jeffrey M. Gold
Laura Krawczyk
MORGAN LEWIS & BROCKIUS LLP
101 Park Avenue
New York, New York 10178

Scott D. Stimpson
The Law Office of Scott Stimpson
Suite 1102
445 Hamilton Avenue
White Plains, NY 10601
**Counsel for Casio Inc. and Casio Computer Co., Ltd.**

/s/ Joseph E. Cwik
Joseph E. Cwik

# WELSH & KATZ, LTD.

*Attorneys at Law*

120 SOUTH RIVERSIDE PLAZA · 22ND FLOOR
CHICAGO, ILLINOIS 60606-3912

TELEPHONE (312) 655-1500
FACSIMILE (312) 655-1501

www.welshkatz.com

A. SIDNEY KATZ·
RICHARD L. WOOD·
JEROLD B. SCHNAYER
JOSEPH R. MARCUS
GERALD S. SCHUR
GERALD T. SHEKLETON
JAMES A. SCHEER
DANIEL R. CHERRY
ROBERT B. BREISBLATT
JAMES P. WHITE
R. MARK HALLIGAN
HARTWELL P. MORSE, III
EDWARD P. GAMSON, Ph.D.
KATHLEEN A. RHEINTGEN
THOMAS W. TOLPIN·
RICHARD W. McLAREN, JR.
ELLIOTT C. BANKENDORF
ERIC D. COHEN
JOHN L. AMBROGI
JULIE A. KATZ
JON P. CHRISTENSEN
WALTER J. KAWULA, JR.
LEONARD FRIEDMAN
STEVEN E. FELDMAN
JEFFREY W. SALMON
LOUISE T. WALSH
PAUL M. VARGO, Ph.D.
JOSEPH E. CWIK

J. ARON CARNAHAN
ERIK B. FLOM, Ph.D.
JAMES B. RADEN
———
RICHARD J. GURAK
DANIEL M. GURFINKEL
MICHELE S. KATZ·
BRIAN J. SODIKOFF
BRETT M. TOLPIN
GEORGE S. PAVLIK
MICHAEL A. KROL, Ph.D.
SHERRY L. ROLLO
CRAIG M. KUCHII
STEPHEN P. BENSON
GREGORY J. SKONY

OF COUNSEL
LAURIE A. HAYNIE
JAMES J. MYRICK
THOMAS R. VIGIL
PHILIP D. SEGREST, JR.··
WALLACE L. OLIVER, Ph.D.
LAURA A. LABEOTS, Ph.D.

DONALD L. WELSH (1925-1998)

· ALSO ADMITTED IN DISTRICT OF COLUMBIA
·· ALSO ADMITTED IN ALABAMA

June 29, 2007

**VIA E-MAIL**
Jeffrey Gold, Esq.
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178

Re:    Casio Inc. v. Papst Licensing, Case No. 1:06 CV 011751 (GK)

Dear Jeffrey:

In response to Casio Inc. Interrogatory No. 2, Papst hereby identifies the following documents pursuant to Rule 33(d):

| Beginning Bates No. For Each Document | End Bates No. For Each Document |
|---|---|
| PAP0001093 | PAP0001355 |
| PAP0002914 | PAP0002914 |
| PAP0002915 | PAP0002919 |
| PAP0002920 | PAP0002923 |
| PAP0002924 | PAP0002929 |
| PAP0002930 | PAP0002934 |
| PAP0002935 | PAP0002935 |
| PAP0002936 | PAP0002941 |
| PAP0002942 | PAP0002960 |
| PAP0002961 | PAP0003352 |
| PAP0003353 | PAP0003353 |
| PAP0003354 | PAP0003367 |
| PAP0003368 | PAP0003474 |
| PAP0003475 | PAP0003525 |

Jeffrey Gold                                                June 29, 2007
                                                                 Page 2

```
PAP0003526   PAP0003667
PAP0003668   PAP0003669
PAP0003670   PAP0003670
PAP0003671   PAP0003676
PAP0003677   PAP0003723
PAP0003724   PAP0003724
PAP0003725   PAP0004091
PAP0004092   PAP0004094
PAP0004095   PAP0004098
PAP0004099   PAP0004102
PAP0004103   PAP0004105
PAP0004106   PAP0004108
PAP0004109   PAP0004110
PAP0004111   PAP0004113
PAP0004114   PAP0004114
PAP0004115   PAP0004117
PAP0004118   PAP0004120
PAP0004121   PAP0004124
PAP0004125   PAP0004127
PAP0004128   PAP0004129
PAP0004130   PAP0004131
PAP0004132   PAP0004134
PAP0004135   PAP0004136
PAP0004137   PAP0004142
PAP0005150   PAP0005159
PAP0005160   PAP0005198
PAP0005199   PAP0005209
PAP0005210   PAP0005235
PAP0005236   PAP0005242
PAP0005243   PAP0005263
PAP0005264   PAP0005275
PAP0005276   PAP0005288
PAP0005289   PAP0005296
PAP0005297   PAP0005427
PAP0005428   PAP0005529
PAP0005530   PAP0005537
PAP0005538   PAP0005560
PAP0005561   PAP0005594
PAP0005595   PAP0005621
PAP0005622   PAP0005633
PAP0005634   PAP0005641
PAP0005642   PAP0005665
PAP0005666   PAP0005690
PAP0005691   PAP0005706
PAP0005707   PAP0005718
PAP0005719   PAP0005730
PAP0005731   PAP0005744
PAP0005745   PAP0005758
PAP0005759   PAP0005772
PAP0005773   PAP0005780
PAP0005781   PAP0005804
PAP0005805   PAP0005827
PAP0005828   PAP0005836
```

Jeffrey Gold

| | |
|---|---|
| PAP0005837 | PAP0005846 |
| PAP0005847 | PAP0005859 |
| PAP0005860 | PAP0005882 |
| PAP0005883 | PAP0005898 |
| PAP0005899 | PAP0005926 |
| PAP0005927 | PAP0005942 |
| PAP0005943 | PAP0005953 |
| PAP0005954 | PAP0005962 |
| PAP0005963 | PAP0005988 |
| PAP0005989 | PAP0005995 |
| PAP0005996 | PAP0006008 |
| PAP0006009 | PAP0006036 |
| PAP0006037 | PAP0006046 |
| PAP0006047 | PAP0006106 |
| PAP0006107 | PAP0006115 |
| PAP0006116 | PAP0006133 |
| PAP0006134 | PAP0006151 |
| PAP0006152 | PAP0006164 |
| PAP0006165 | PAP0006181 |
| PAP0006182 | PAP0006209 |
| PAP0006210 | PAP0006219 |
| PAP0006220 | PAP0006253 |
| PAP0006254 | PAP0006261 |
| PAP0006262 | PAP0006274 |
| PAP0006275 | PAP0006328 |
| PAP0006329 | PAP0006448 |
| PAP0006449 | PAP0006459 |
| PAP0006460 | PAP0006486 |
| PAP0006487 | PAP0006605 |
| PAP0006606 | PAP0006621 |
| PAP0006622 | PAP0006634 |
| PAP0006635 | PAP0006674 |
| PAP0006675 | PAP0006724 |
| PAP0006725 | PAP0006821 |
| PAP0006822 | PAP0006838 |
| PAP0006839 | PAP0006855 |
| PAP0006856 | PAP0006862 |
| PAP0006863 | PAP0006873 |
| PAP0006874 | PAP0006885 |
| PAP0006886 | PAP0006901 |
| PAP0006902 | PAP0006999 |
| PAP0007000 | PAP0007021 |
| PAP0007032 | PAP0007055 |
| PAP0007066 | PAP0007087 |
| PAP0007863 | PAP0008130 |
| PAP0008131 | PAP0008393 |
| PAP0013821 | PAP0013822 |
| PAP0013823 | PAP0013824 |
| PAP0013825 | PAP0013826 |
| PAP0013827 | PAP0013828 |
| PAP0013829 | PAP0013830 |
| PAP0013831 | PAP0013832 |
| PAP0013833 | PAP0013834 |

Jeffrey Gold

June 29, 2007
Page 4

```
PAP0013835   PAP0013838
PAP0013839   PAP0013843
PAP0013844   PAP0013847
PAP0013848   PAP0013850
PAP0013851   PAP0013855
PAP0013856   PAP0013873
```

In response to Casio Inc. Interrogatory No. 4, Papst hereby identifies the following documents pursuant to Rule 33(d):

| Beginning Bates No. For Each Document | End Bates No. For Each Document |
|---|---|
| PAP0000001 | PAP0000006 |
| PAP0000007 | PAP0000007 |
| PAP0000008 | PAP0000008 |
| PAP0000009 | PAP0000009 |
| PAP0000010 | PAP0000010 |
| PAP0000011 | PAP0000011 |
| PAP0000012 | PAP0000018 |
| PAP0000019 | PAP0000025 |
| PAP0000026 | PAP0000027 |
| PAP0000028 | PAP0000029 |
| PAP0000030 | PAP0000031 |
| PAP0000032 | PAP0000033 |
| PAP0000034 | PAP0000041 |
| PAP0000042 | PAP0000042 |
| PAP0000043 | PAP0000043 |
| PAP0000044 | PAP0000046 |
| PAP0000047 | PAP0000049 |
| PAP0000050 | PAP0000054 |
| PAP0000055 | PAP0000071 |
| PAP0000072 | PAP0000073 |
| PAP0000074 | PAP0000075 |
| PAP0000076 | PAP0000076 |
| PAP0000077 | PAP0000078 |
| PAP0000079 | PAP0000081 |
| PAP0000082 | PAP0000084 |
| PAP0000085 | PAP0000085 |
| PAP0000086 | PAP0000087 |
| PAP0000088 | PAP0000089 |
| PAP0000090 | PAP0000095 |
| PAP0000096 | PAP0000098 |
| PAP0000099 | PAP0000106 |
| PAP0000107 | PAP0000107 |
| PAP0000108 | PAP0000117 |
| PAP0000118 | PAP0000119 |
| PAP0000120 | PAP0000121 |
| PAP0000122 | PAP0000124 |

Jeffrey Gold

```
PAP0000125   PAP0000126
PAP0000127   PAP0000127
PAP0000128   PAP0000129
PAP0000130   PAP0000131
PAP0000132   PAP0000132
PAP0000133   PAP0000137
PAP0000138   PAP0000142
PAP0000143   PAP0000155
PAP0000156   PAP0000157
PAP0000158   PAP0000158
PAP0000159   PAP0000160
PAP0000161   PAP0000172
PAP0000173   PAP0000174
PAP0000175   PAP0000175
PAP0000176   PAP0000176
PAP0000177   PAP0000184
PAP0000185   PAP0000189
PAP0000190   PAP0000190
PAP0000191   PAP0000192
PAP0000193   PAP0000197
PAP0000198   PAP0000199
PAP0000200   PAP0000201
PAP0000202   PAP0000203
PAP0000204   PAP0000205
PAP0000206   PAP0000207
PAP0000208   PAP0000216
PAP0000217   PAP0000218
PAP0000219   PAP0000222
PAP0000223   PAP0000224
PAP0000225   PAP0000226
PAP0000227   PAP0000231
PAP0000232   PAP0000232
PAP0000233   PAP0000234
PAP0000235   PAP0000236
PAP0000237   PAP0000238
PAP0000239   PAP0000241
PAP0000242   PAP0000246
PAP0000247   PAP0000252
PAP0000253   PAP0000253
PAP0000254   PAP0000255
PAP0000256   PAP0000257
PAP0000258   PAP0000259
PAP0000260   PAP0000265
PAP0000266   PAP0000269
PAP0000270   PAP0000270
PAP0000271   PAP0000276
PAP0000277   PAP0000278
PAP0000279   PAP0000279
PAP0000280   PAP0000287
PAP0000288   PAP0000288
PAP0000289   PAP0000291
PAP0000292   PAP0000292
PAP0000293   PAP0000294
```

Jeffrey Gold

```
PAP0000295   PAP0000300
PAP0000301   PAP0000302
PAP0000303   PAP0000304
PAP0000305   PAP0000305
PAP0000306   PAP0000307
PAP0000308   PAP0000309
PAP0000310   PAP0000311
PAP0000312   PAP0000313
PAP0000314   PAP0000318
PAP0000319   PAP0000325
PAP0000326   PAP0000330
PAP0000331   PAP0000335
PAP0000336   PAP0000337
PAP0000338   PAP0000339
PAP0000340   PAP0000344
PAP0000345   PAP0000349
PAP0000350   PAP0000354
PAP0000355   PAP0000360
PAP0000361   PAP0000365
PAP0000366   PAP0000366
PAP0000367   PAP0000368
PAP0000369   PAP0000376
PAP0000377   PAP0000379
PAP0000380   PAP0000382
PAP0000383   PAP0000386
PAP0000387   PAP0000400
PAP0000401   PAP0000410
PAP0000411   PAP0000412
PAP0000413   PAP0000416
PAP0000417   PAP0000419
PAP0000420   PAP0000425
PAP0000426   PAP0000427
PAP0000428   PAP0000429
PAP0000430   PAP0000430
PAP0000431   PAP0000436
PAP0000437   PAP0000440
PAP0000441   PAP0000443
PAP0000444   PAP0000446
PAP0000447   PAP0000449
PAP0000450   PAP0000452
PAP0000453   PAP0000456
PAP0000457   PAP0000458
PAP0000459   PAP0000459
PAP0000460   PAP0000465
PAP0000466   PAP0000466
PAP0000467   PAP0000468
PAP0000469   PAP0000471
PAP0000472   PAP0000473
PAP0000474   PAP0000474
PAP0000475   PAP0000476
PAP0000477   PAP0000477
PAP0000478   PAP0000479
PAP0000480   PAP0000485
```

Jeffrey Gold

```
PAP0000486   PAP0000491
PAP0000492   PAP0000493
PAP0000494   PAP0000495
PAP0000496   PAP0000498
PAP0000499   PAP0000500
PAP0000501   PAP0000501
PAP0000502   PAP0000509
PAP0000510   PAP0000511
PAP0000512   PAP0000512
PAP0000513   PAP0000515
PAP0000516   PAP0000518
PAP0000519   PAP0000526
PAP0000527   PAP0000527
PAP0000528   PAP0000531
PAP0000532   PAP0000532
PAP0000533   PAP0000537
PAP0000538   PAP0000541
PAP0000542   PAP0000543
PAP0000544   PAP0000546
PAP0000547   PAP0000563
PAP0000564   PAP0000565
PAP0000566   PAP0000567
PAP0000568   PAP0000586
PAP0000587   PAP0000591
PAP0000592   PAP0000593
PAP0000594   PAP0000596
PAP0000597   PAP0000597
PAP0000598   PAP0000599
PAP0000600   PAP0000605
PAP0000606   PAP0000607
PAP0000608   PAP0000608
PAP0000609   PAP0000610
PAP0000611   PAP0000612
PAP0000613   PAP0000614
PAP0000615   PAP0000615
PAP0000616   PAP0000618
PAP0000619   PAP0000624
PAP0000625   PAP0000626
PAP0000627   PAP0000627
PAP0000628   PAP0000629
PAP0000630   PAP0000639
PAP0000640   PAP0000647
PAP0000648   PAP0000649
PAP0000650   PAP0000651
PAP0000652   PAP0000664
PAP0000665   PAP0000665
PAP0000666   PAP0000668
PAP0000669   PAP0000669
PAP0000670   PAP0000670
PAP0000671   PAP0000672
PAP0000673   PAP0000676
PAP0000677   PAP0000677
PAP0000678   PAP0000678
```

Jeffrey Gold

| | |
|---|---|
| PAP0000679 | PAP0000680 |
| PAP0000681 | PAP0000681 |
| PAP0000682 | PAP0000682 |
| PAP0000683 | PAP0000684 |
| PAP0000685 | PAP0000693 |
| PAP0000694 | PAP0000695 |
| PAP0000696 | PAP0000698 |
| PAP0000699 | PAP0000702 |
| PAP0000703 | PAP0000704 |
| PAP0000705 | PAP0000706 |
| PAP0000707 | PAP0000709 |
| PAP0000710 | PAP0000717 |
| PAP0000718 | PAP0000719 |
| PAP0000720 | PAP0000721 |
| PAP0000722 | PAP0000724 |
| PAP0000725 | PAP0000727 |
| PAP0000728 | PAP0000728 |
| PAP0000729 | PAP0000733 |
| PAP0000734 | PAP0000738 |
| PAP0000739 | PAP0000744 |
| PAP0000745 | PAP0000745 |
| PAP0000746 | PAP0000751 |
| PAP0000752 | PAP0000753 |
| PAP0000754 | PAP0000755 |
| PAP0000756 | PAP0000761 |
| PAP0000762 | PAP0000762 |
| PAP0000763 | PAP0000764 |
| PAP0000765 | PAP0000770 |
| PAP0000771 | PAP0000776 |
| PAP0000777 | PAP0000778 |
| PAP0000779 | PAP0000779 |
| PAP0000780 | PAP0000780 |
| PAP0000781 | PAP0000781 |
| PAP0000782 | PAP0000787 |
| PAP0000788 | PAP0000789 |
| PAP0000790 | PAP0000790 |
| PAP0000791 | PAP0000792 |
| PAP0000793 | PAP0000800 |
| PAP0000801 | PAP0000803 |
| PAP0000804 | PAP0000806 |
| PAP0000807 | PAP0000808 |
| PAP0000809 | PAP0000811 |
| PAP0000812 | PAP0000814 |
| PAP0000815 | PAP0000816 |
| PAP0000817 | PAP0000818 |
| PAP0000819 | PAP0000821 |
| PAP0000822 | PAP0000822 |
| PAP0000823 | PAP0000824 |
| PAP0000825 | PAP0000830 |
| PAP0000831 | PAP0000835 |
| PAP0000836 | PAP0000850 |
| PAP0000851 | PAP0000852 |
| PAP0000853 | PAP0000854 |

Jeffrey Gold

| | |
|---|---|
| PAP0000855 | PAP0000856 |
| PAP0000857 | PAP0000857 |
| PAP0000858 | PAP0000858 |
| PAP0000859 | PAP0000860 |
| PAP0000861 | PAP0000866 |
| PAP0000867 | PAP0000868 |
| PAP0000869 | PAP0000871 |
| PAP0000872 | PAP0000877 |
| PAP0000878 | PAP0000883 |
| PAP0000884 | PAP0000885 |
| PAP0000886 | PAP0000886 |
| PAP0000887 | PAP0000888 |
| PAP0000889 | PAP0000894 |
| PAP0000895 | PAP0000910 |
| PAP0000911 | PAP0000919 |
| PAP0000920 | PAP0000922 |
| PAP0000923 | PAP0000923 |
| PAP0000924 | PAP0000925 |
| PAP0000926 | PAP0000928 |
| PAP0000929 | PAP0000929 |
| PAP0000930 | PAP0000930 |
| PAP0000931 | PAP0000933 |
| PAP0000934 | PAP0000942 |
| PAP0000943 | PAP0000944 |
| PAP0000945 | PAP0000952 |
| PAP0000953 | PAP0000961 |
| PAP0000962 | PAP0000962 |
| PAP0000963 | PAP0000964 |
| PAP0000965 | PAP0000966 |
| PAP0000967 | PAP0000969 |
| PAP0000970 | PAP0000987 |
| PAP0000988 | PAP0000989 |
| PAP0000990 | PAP0000992 |
| PAP0000993 | PAP0000998 |
| PAP0000999 | PAP0000999 |
| PAP0001000 | PAP0001001 |
| PAP0001002 | PAP0001003 |
| PAP0001004 | PAP0001009 |
| PAP0001010 | PAP0001011 |
| PAP0001012 | PAP0001012 |
| PAP0001013 | PAP0001021 |
| PAP0001022 | PAP0001023 |
| PAP0001024 | PAP0001026 |
| PAP0001027 | PAP0001029 |
| PAP0001030 | PAP0001031 |
| PAP0001032 | PAP0001033 |
| PAP0001034 | PAP0001035 |
| PAP0001036 | PAP0001037 |
| PAP0001038 | PAP0001039 |
| PAP0001040 | PAP0001040 |
| PAP0001041 | PAP0001042 |
| PAP0001043 | PAP0001043 |
| PAP0001044 | PAP0001045 |

Jeffrey Gold

```
PAP0001046    PAP0001048
PAP0001049    PAP0001053
PAP0001054    PAP0001055
PAP0001056    PAP0001057
PAP0001058    PAP0001062
PAP0001063    PAP0001064
PAP0001065    PAP0001066
PAP0001067    PAP0001072
PAP0001073    PAP0001083
PAP0001084    PAP0001092
PAP0001356    PAP0001358
PAP0001359    PAP0001361
PAP0001362    PAP0001365
PAP0001366    PAP0001366
PAP0001367    PAP0001369
PAP0001370    PAP0001371
PAP0001372    PAP0001374
PAP0001375    PAP0001381
PAP0001382    PAP0001383
PAP0001384    PAP0001385
PAP0001386    PAP0001388
PAP0001389    PAP0001390
PAP0001391    PAP0001392
PAP0001393    PAP0001395
PAP0001396    PAP0001401
PAP0001402    PAP0001406
PAP0001407    PAP0001408
PAP0001409    PAP0001409
PAP0001410    PAP0001410
PAP0001411    PAP0001418
PAP0001419    PAP0001429
PAP0001430    PAP0001431
PAP0001432    PAP0001433
PAP0001434    PAP0001444
PAP0001445    PAP0001446
PAP0001447    PAP0001447
PAP0001448    PAP0001458
PAP0001459    PAP0001459
PAP0001460    PAP0001460
PAP0001461    PAP0001461
PAP0001462    PAP0001464
PAP0001465    PAP0001466
PAP0001467    PAP0001468
PAP0001469    PAP0001471
PAP0001472    PAP0001476
PAP0001477    PAP0001478
PAP0001479    PAP0001480
PAP0001481    PAP0001482
PAP0001483    PAP0001484
PAP0001485    PAP0001486
PAP0001487    PAP0001492
PAP0001493    PAP0001494
PAP0001495    PAP0001497
```

```
PAP0001498   PAP0001502
PAP0001503   PAP0001506
PAP0001507   PAP0001507
PAP0001508   PAP0001509
PAP0001510   PAP0001512
PAP0001513   PAP0001514
PAP0001515   PAP0001516
PAP0001517   PAP0001521
PAP0001522   PAP0001524
PAP0001525   PAP0001526
PAP0001527   PAP0001527
PAP0001528   PAP0001529
PAP0001530   PAP0001535
PAP0001536   PAP0001537
PAP0001538   PAP0001540
PAP0001541   PAP0001553
PAP0001554   PAP0001621
PAP0001622   PAP0001622
PAP0001623   PAP0001625
PAP0001626   PAP0001626
PAP0001627   PAP0001629
PAP0001630   PAP0001632
PAP0001633   PAP0001637
PAP0001638   PAP0001642
PAP0001643   PAP0001644
PAP0001645   PAP0001649
PAP0001650   PAP0001651
PAP0001652   PAP0001652
PAP0001653   PAP0001657
PAP0001658   PAP0001659
PAP0001660   PAP0001660
PAP0001661   PAP0001665
PAP0001666   PAP0001671
PAP0001672   PAP0001676
PAP0001677   PAP0001684
PAP0001685   PAP0001685
PAP0001686   PAP0001688
PAP0001689   PAP0001693
PAP0001694   PAP0001694
PAP0001695   PAP0001695
PAP0001696   PAP0001699
PAP0001700   PAP0001710
PAP0001711   PAP0001716
PAP0001717   PAP0001718
PAP0001719   PAP0001722
PAP0001723   PAP0001728
PAP0001729   PAP0001729
PAP0001730   PAP0001735
PAP0001736   PAP0001738
PAP0001739   PAP0001740
PAP0001741   PAP0001762
PAP0001763   PAP0001774
PAP0001775   PAP0001776
```

Jeffrey Gold

PAP0001777    PAP0001778
PAP0001779    PAP0001788
PAP0001789    PAP0001800
PAP0001801    PAP0001803
PAP0001804    PAP0001808
PAP0001809    PAP0001809
PAP0001810    PAP0001810
PAP0001811    PAP0001814
PAP0001815    PAP0001818
PAP0001819    PAP0001819
PAP0001820    PAP0001820
PAP0001821    PAP0001824
PAP0001825    PAP0001825
PAP0001826    PAP0001826
PAP0001827    PAP0001840
PAP0001841    PAP0001842
PAP0001843    PAP0001843
PAP0001844    PAP0001848
PAP0001849    PAP0001849
PAP0001850    PAP0001851
PAP0001852    PAP0001853
PAP0001854    PAP0001855
PAP0001856    PAP0001857
PAP0001858    PAP0001864
PAP0001865    PAP0001866
PAP0001867    PAP0001868
PAP0001869    PAP0001877
PAP0001878    PAP0001879
PAP0001880    PAP0001881
PAP0001882    PAP0001883
PAP0001884    PAP0001885
PAP0001886    PAP0001893
PAP0001894    PAP0001895
PAP0001896    PAP0001897
PAP0001898    PAP0001904
PAP0001905    PAP0001905
PAP0001906    PAP0001907
PAP0001908    PAP0001917
PAP0001918    PAP0001918
PAP0001919    PAP0001921
PAP0001922    PAP0001925
PAP0001926    PAP0001928
PAP0001929    PAP0001929
PAP0001930    PAP0001933
PAP0001934    PAP0001939
PAP0001940    PAP0001941
PAP0001942    PAP0001942
PAP0001943    PAP0001944
PAP0001945    PAP0001946
PAP0001947    PAP0001948
PAP0001949    PAP0001950
PAP0001951    PAP0001959
PAP0001960    PAP0001961

Jeffrey Gold

June 29, 2007
Page 13

```
PAP0001962    PAP0001962
PAP0001963    PAP0001969
PAP0001970    PAP0001976
PAP0001977    PAP0001987
PAP0001988    PAP0001989
PAP0001990    PAP0001990
PAP0001991    PAP0002000
PAP0002001    PAP0002010
PAP0002014    PAP0002015
PAP0002016    PAP0002016
PAP0002017    PAP0002036
PAP0002037    PAP0002044
PAP0002045    PAP0002046
PAP0002047    PAP0002048
PAP0002049    PAP0002051
PAP0002052    PAP0002062
PAP0002063    PAP0002064
PAP0002065    PAP0002065
PAP0002066    PAP0002071
PAP0002072    PAP0002083
PAP0002084    PAP0002084
PAP0002085    PAP0002089
PAP0002090    PAP0002094
PAP0002095    PAP0002095
PAP0002096    PAP0002098
PAP0002099    PAP0002103
PAP0002104    PAP0002105
PAP0002106    PAP0002107
PAP0002108    PAP0002118
PAP0002119    PAP0002120
PAP0002121    PAP0002121
PAP0002122    PAP0002127
PAP0002128    PAP0002128
PAP0002129    PAP0002129
PAP0002130    PAP0002130
PAP0002131    PAP0002134
PAP0002135    PAP0002141
PAP0002142    PAP0002143
PAP0002144    PAP0002144
PAP0002145    PAP0002145
PAP0002146    PAP0002151
PAP0002152    PAP0002152
PAP0002153    PAP0002153
PAP0002154    PAP0002162
PAP0002163    PAP0002175
PAP0002176    PAP0002181
PAP0002182    PAP0002183
PAP0002184    PAP0002184
PAP0002185    PAP0002186
PAP0002187    PAP0002194
PAP0002195    PAP0002206
PAP0002207    PAP0002218
PAP0002219    PAP0002220
```

Jeffrey Gold

June 29, 2007
Page 14

```
PAP0002221   PAP0002221
PAP0002222   PAP0002223
PAP0002224   PAP0002224
PAP0002225   PAP0002237
PAP0002238   PAP0002239
PAP0002240   PAP0002240
PAP0002241   PAP0002249
PAP0002250   PAP0002260
PAP0002261   PAP0002263
PAP0002264   PAP0002264
PAP0002265   PAP0002273
PAP0002274   PAP0002275
PAP0002276   PAP0002279
PAP0002280   PAP0002281
PAP0002282   PAP0002293
PAP0002294   PAP0002294
PAP0002295   PAP0002296
PAP0002297   PAP0002297
PAP0002298   PAP0002302
PAP0002303   PAP0002304
PAP0002305   PAP0002314
PAP0002315   PAP0002315
PAP0002316   PAP0002318
PAP0002319   PAP0002321
PAP0002322   PAP0002322
PAP0002323   PAP0002324
PAP0002325   PAP0002326
PAP0002327   PAP0002334
PAP0002335   PAP0002337
PAP0002338   PAP0002338
PAP0002339   PAP0002339
PAP0002340   PAP0002342
PAP0002343   PAP0002345
PAP0002346   PAP0002348
PAP0002349   PAP0002353
PAP0002354   PAP0002354
PAP0002355   PAP0002356
PAP0002357   PAP0002357
PAP0002358   PAP0002365
PAP0002366   PAP0002368
PAP0002369   PAP0002369
PAP0002370   PAP0002370
PAP0002371   PAP0002372
PAP0002373   PAP0002378
PAP0018684   PAP0018690
PAP0018691   PAP0018694
PAP0018695   PAP0018700
PAP0018701   PAP0018701
PAP0018702   PAP0018703
PAP0018704   PAP0018705
PAP0018706   PAP0018736
PAP0018737   PAP0018745
PAP0018746   PAP0018749
```

Jeffrey Gold

```
PAP0018752   PAP0018753
PAP0018754   PAP0018757
PAP0018758   PAP0018760
PAP0018761   PAP0018761
PAP0018762   PAP0018765
PAP0018766   PAP0018769
PAP0018774   PAP0018775
PAP0018776   PAP0018776
PAP0018777   PAP0018780
PAP0018781   PAP0018781
PAP0018782   PAP0018786
PAP0018787   PAP0018789
PAP0018790   PAP0018796
PAP0018797   PAP0018800
PAP0018801   PAP0018804
PAP0018805   PAP0018809
PAP0018810   PAP0018811
PAP0018812   PAP0018825
PAP0018826   PAP0018827
PAP0018828   PAP0018829
PAP0018830   PAP0018831
PAP0018832   PAP0018835
PAP0018836   PAP0018839
PAP0018842   PAP0018864
PAP0018865   PAP0018866
PAP0018867   PAP0018869
PAP0018870   PAP0018872
PAP0018873   PAP0018875
PAP0018876   PAP0018877
PAP0018878   PAP0018884
PAP0018885   PAP0018886
PAP0018887   PAP0018889
PAP0018890   PAP0018891
PAP0018892   PAP0018899
PAP0018900   PAP0018905
PAP0018906   PAP0018910
PAP0018911   PAP0018913
PAP0018914   PAP0018918
PAP0018919   PAP0018921
PAP0018922   PAP0018925
PAP0018926   PAP0018929
PAP0018930   PAP0018933
PAP0018934   PAP0018936
PAP0018937   PAP0018940
PAP0018941   PAP0018943
PAP0018944   PAP0018948
PAP0018949   PAP0018951
PAP0018952   PAP0018954
PAP0018955   PAP0018956
PAP0018957   PAP0018957
PAP0018958   PAP0018959
PAP0018960   PAP0018960
PAP0018961   PAP0018962
```

Jeffrey Gold

```
PAP0018963    PAP0018964
PAP0018965    PAP0018965
PAP0018966    PAP0018970
PAP0018972    PAP0018973
PAP0018974    PAP0018977
PAP0018978    PAP0018980
PAP0018981    PAP0018982
PAP0018983    PAP0018984
PAP0018985    PAP0018988
PAP0018989    PAP0018990
PAP0018991    PAP0018993
PAP0018994    PAP0018998
PAP0018999    PAP0019001
PAP0019002    PAP0019013
PAP0019014    PAP0019019
PAP0019020    PAP0019023
PAP0019024    PAP0019025
PAP0019026    PAP0019026
PAP0019027    PAP0019031
PAP0019032    PAP0019033
PAP0019034    PAP0019035
PAP0019036    PAP0019037
PAP0019038    PAP0019039
PAP0019040    PAP0019041
PAP0019042    PAP0019043
PAP0019044    PAP0019046
PAP0019072    PAP0019074
PAP0019075    PAP0019077
PAP0019082    PAP0019083
PAP0019084    PAP0019088
PAP0019089    PAP0019090
PAP0019091    PAP0019092
PAP0019093    PAP0019095
PAP0019096    PAP0019097
PAP0019098    PAP0019099
PAP0019100    PAP0019101
PAP0019102    PAP0019103
PAP0019104    PAP0019105
PAP0019106    PAP0019109
PAP0019110    PAP0019116
PAP0019117    PAP0019124
PAP0019125    PAP0019129
PAP0019130    PAP0019131
PAP0019132    PAP0019145
PAP0019146    PAP0019147
PAP0019148    PAP0019148
PAP0019149    PAP0019155
PAP0019156    PAP0019158
PAP0019159    PAP0019162
PAP0019168    PAP0019171
PAP0019172    PAP0019200
PAP0019201    PAP0019208
PAP0019209    PAP0019210
```

Jeffrey Gold                                                        June 29, 2007
                                                                       Page 17

```
PAP0019211   PAP0019212
PAP0019213   PAP0019216
PAP0019217   PAP0019219
PAP0019220   PAP0019220
PAP0019221   PAP0019222
PAP0019223   PAP0019225
PAP0019226   PAP0019229
PAP0019230   PAP0019236
PAP0019237   PAP0019238
PAP0019239   PAP0019245
PAP0019246   PAP0019258
PAP0019259   PAP0019260
PAP0019261   PAP0019272
PAP0019273   PAP0019274
PAP0019275   PAP0019276
PAP0019277   PAP0019280
PAP0019281   PAP0019285
PAP0019286   PAP0019313
PAP0019314   PAP0019315
PAP0019316   PAP0019317
PAP0019318   PAP0019330
PAP0019331   PAP0019339
PAP0019340   PAP0019341
PAP0019342   PAP0019343
PAP0019344   PAP0019346
PAP0019347   PAP0019355
PAP0019356   PAP0019357
PAP0019358   PAP0019362
PAP0019363   PAP0019367
PAP0019368   PAP0019369
PAP0019370   PAP0019373
PAP0019374   PAP0019375
PAP0019376   PAP0019379
PAP0019380   PAP0019381
PAP0019382   PAP0019384
PAP0019385   PAP0019389
PAP0019390   PAP0019391
PAP0019392   PAP0019393
PAP0019394   PAP0019395
PAP0019396   PAP0019397
PAP0019398   PAP0019401
PAP0019402   PAP0019405
PAP0019419   PAP0019426
PAP0019427   PAP0019429
PAP0019430   PAP0019432
PAP0019433   PAP0019436
PAP0019439   PAP0019441
PAP0019442   PAP0019444
PAP0019445   PAP0019446
PAP0019447   PAP0019449
PAP0019450   PAP0019453
PAP0019454   PAP0019466
PAP0019467   PAP0019467
```

Jeffrey Gold

| | |
|---|---|
| PAP0019468 | PAP0019469 |
| PAP0019470 | PAP0019476 |
| PAP0019477 | PAP0019477 |
| PAP0019478 | PAP0019480 |
| PAP0019481 | PAP0019482 |
| PAP0019483 | PAP0019487 |
| PAP0019488 | PAP0019493 |
| PAP0019494 | PAP0019502 |
| PAP0019503 | PAP0019508 |
| PAP0019509 | PAP0019511 |
| PAP0019512 | PAP0019515 |
| PAP0019516 | PAP0019519 |
| PAP0019520 | PAP0019521 |
| PAP0019522 | PAP0019522 |
| PAP0019523 | PAP0019524 |
| PAP0019525 | PAP0019527 |
| PAP0019528 | PAP0019531 |
| PAP0019532 | PAP0019534 |
| PAP0019535 | PAP0019539 |
| PAP0019540 | PAP0019541 |
| PAP0019542 | PAP0019542 |
| PAP0019543 | PAP0019548 |
| PAP0019549 | PAP0019562 |
| PAP0019563 | PAP0019569 |
| PAP0019570 | PAP0019573 |
| PAP0019576 | PAP0019577 |
| PAP0019578 | PAP0019578 |
| PAP0019579 | PAP0019584 |
| PAP0019585 | PAP0019587 |
| PAP0019588 | PAP0019591 |
| PAP0019592 | PAP0019595 |
| PAP0020532 | PAP0020534 |
| PAP0020535 | PAP0020537 |
| PAP0020538 | PAP0020539 |
| PAP0020540 | PAP0020542 |
| PAP0020543 | PAP0020544 |
| PAP0020545 | PAP0020546 |
| PAP0020547 | PAP0020556 |
| PAP0020557 | PAP0020566 |
| PAP0020567 | PAP0020570 |
| PAP0020571 | PAP0020575 |
| PAP0020576 | PAP0020586 |
| PAP0020587 | PAP0020589 |
| PAP0020590 | PAP0020591 |
| PAP0020592 | PAP0020592 |
| PAP0020593 | PAP0020595 |
| PAP0020596 | PAP0020599 |
| PAP0020600 | PAP0020602 |
| PAP0020603 | PAP0020606 |
| PAP0020607 | PAP0020608 |
| PAP0020609 | PAP0020615 |
| PAP0020616 | PAP0020621 |
| PAP0020622 | PAP0020624 |

Jeffrey Gold

| | |
|---|---|
| PAP0020625 | PAP0020627 |
| PAP0020628 | PAP0020629 |
| PAP0020630 | PAP0020631 |
| PAP0020632 | PAP0020634 |
| PAP0020635 | PAP0020638 |
| PAP0020641 | PAP0020642 |
| PAP0020643 | PAP0020643 |
| PAP0020644 | PAP0020654 |
| PAP0020655 | PAP0020656 |
| PAP0020657 | PAP0020658 |
| PAP0020659 | PAP0020660 |
| PAP0020661 | PAP0020662 |
| PAP0020663 | PAP0020663 |
| PAP0020664 | PAP0020672 |
| PAP0020673 | PAP0020674 |
| PAP0020675 | PAP0020681 |
| PAP0020682 | PAP0020688 |
| PAP0020689 | PAP0020693 |
| PAP0020694 | PAP0020700 |
| PAP0020701 | PAP0020709 |
| PAP0020710 | PAP0020711 |
| PAP0020712 | PAP0020715 |
| PAP0020716 | PAP0020718 |
| PAP0020719 | PAP0020726 |
| PAP0020727 | PAP0020728 |
| PAP0020729 | PAP0020732 |
| PAP0020735 | PAP0020737 |
| PAP0020738 | PAP0020746 |
| PAP0020747 | PAP0020748 |
| PAP0020749 | PAP0020750 |
| PAP0020751 | PAP0020752 |
| PAP0020753 | PAP0020756 |
| PAP0020762 | PAP0020766 |
| PAP0020767 | PAP0020794 |
| PAP0020795 | PAP0020797 |
| PAP0020798 | PAP0020799 |
| PAP0020800 | PAP0020801 |
| PAP0020803 | PAP0020804 |
| PAP0020805 | PAP0020806 |
| PAP0020807 | PAP0020835 |
| PAP0020836 | PAP0020847 |
| PAP0020848 | PAP0020849 |
| PAP0020850 | PAP0020850 |
| PAP0020851 | PAP0020852 |
| PAP0020853 | PAP0020853 |
| PAP0020854 | PAP0020855 |
| PAP0020856 | PAP0020862 |
| PAP0020863 | PAP0020865 |
| PAP0020866 | PAP0020867 |
| PAP0020868 | PAP0020871 |
| PAP0020872 | PAP0020873 |
| PAP0020874 | PAP0020875 |
| PAP0020876 | PAP0020876 |

Jeffrey Gold

| | |
|---|---|
| PAP0020877 | PAP0020881 |
| PAP0020882 | PAP0020882 |
| PAP0020883 | PAP0020884 |
| PAP0020885 | PAP0020886 |
| PAP0020887 | PAP0020888 |
| PAP0020889 | PAP0020890 |
| PAP0020891 | PAP0020891 |
| PAP0020892 | PAP0020893 |
| PAP0020894 | PAP0020894 |
| PAP0020895 | PAP0020899 |
| PAP0020900 | PAP0020907 |
| PAP0020908 | PAP0020916 |
| PAP0020917 | PAP0020921 |
| PAP0020922 | PAP0020926 |
| PAP0020927 | PAP0020927 |
| PAP0020928 | PAP0020932 |
| PAP0020933 | PAP0020933 |
| PAP0020934 | PAP0020935 |
| PAP0020936 | PAP0020937 |
| PAP0020938 | PAP0020938 |
| PAP0020939 | PAP0020940 |
| PAP0020941 | PAP0020942 |
| PAP0020943 | PAP0020944 |
| PAP0020945 | PAP0020946 |
| PAP0020947 | PAP0020949 |
| PAP0020950 | PAP0020951 |
| PAP0020952 | PAP0020958 |
| PAP0020959 | PAP0020974 |
| PAP0020975 | PAP0021002 |
| PAP0021003 | PAP0021003 |
| PAP0021004 | PAP0021006 |
| PAP0021007 | PAP0021011 |
| PAP0021012 | PAP0021012 |
| PAP0021013 | PAP0021014 |
| PAP0021015 | PAP0021016 |
| PAP0021017 | PAP0021018 |
| PAP0021019 | PAP0021031 |
| PAP0021032 | PAP0021032 |
| PAP0021033 | PAP0021034 |
| PAP0021035 | PAP0021047 |
| PAP0021048 | PAP0021050 |
| PAP0021051 | PAP0021052 |
| PAP0021053 | PAP0021053 |
| PAP0021054 | PAP0021055 |
| PAP0021056 | PAP0021057 |
| PAP0021058 | PAP0021058 |
| PAP0021059 | PAP0021064 |
| PAP0021065 | PAP0021068 |
| PAP0021069 | PAP0021073 |
| PAP0021074 | PAP0021075 |
| PAP0021078 | PAP0021080 |
| PAP0021081 | PAP0021081 |
| PAP0021082 | PAP0021083 |

Jeffrey Gold

```
PAP0021084    PAP0021087
PAP0021088    PAP0021092
PAP0021093    PAP0021101
PAP0021102    PAP0021102
PAP0021103    PAP0021104
PAP0021105    PAP0021106
PAP0021107    PAP0021108
PAP0021109    PAP0021112
PAP0021113    PAP0021114
PAP0021115    PAP0021119
PAP0021128    PAP0021130
PAP0021131    PAP0021133
PAP0021134    PAP0021161
PAP0021162    PAP0021163
PAP0021164    PAP0021167
PAP0021168    PAP0021173
PAP0021174    PAP0021175
PAP0021176    PAP0021176
PAP0021177    PAP0021180
PAP0021190    PAP0021191
PAP0021192    PAP0021195
PAP0021196    PAP0021200
PAP0021201    PAP0021202
PAP0021203    PAP0021208
PAP0021209    PAP0021210
PAP0021211    PAP0021211
PAP0021212    PAP0021215
PAP0021216    PAP0021216
PAP0021217    PAP0021218
PAP0021219    PAP0021222
PAP0021223    PAP0021223
PAP0021224    PAP0021225
PAP0021226    PAP0021228
PAP0021229    PAP0021232
PAP0021233    PAP0021239
PAP0021240    PAP0021240
PAP0021241    PAP0021244
PAP0021246    PAP0021247
PAP0021248    PAP0021250
PAP0021251    PAP0021252
PAP0021254    PAP0021255
PAP0021256    PAP0021262
PAP0021263    PAP0021269
PAP0021270    PAP0021337
PAP0021338    PAP0021347
PAP0021348    PAP0021348
PAP0021349    PAP0021350
PAP0021351    PAP0021352
PAP0021353    PAP0021353
PAP0021354    PAP0021356
PAP0021357    PAP0021357
PAP0021358    PAP0021358
PAP0021359    PAP0021360
```

Jeffrey Gold

June 29, 2007
Page 22

PAP0021361   PAP0021362
PAP0021363   PAP0021368

By:  _____
Joseph E. Cwik

JEC/pm
cc:    Jerold B. Schnayer
       Campbell Killefer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASIO INC.

                Plaintiff,

      v.

PAPST LICENSING GMBH & CO. KG,
                Defendant.

PAPST LICENSING GMBH & CO. KG,
                Counter-Plaintiff

      v.

CASIO INC. and
CASIO COMPUTER CO., LTD.

                Counter-Defendants

Civil Action No. 1:06 CV 01751

Judge: Gladys Kessler

Magistrate Judge: Deborah A Robinson

**[PROPOSED] ORDER DENYING CASIO'S MOTION FOR RULE 37
SANCTIONS FOR PAPST'S NON-COMPLIANCE WITH THIS COURT'S
ORDERS**

Upon consideration of the motion of Casio's Motion for Rule 37 Sanctions for

Papst's Non-Compliance With This Court's Order, it is hereby

**ORDERED** that Casio's Motion is denied.

DATED: _____

                                    _____
                                      Deborah Robinson
                                      United States Magistrate Judge